95 N.J. Super. 455 (1967)
231 A.2d 816
MEAD JOHNSON AND COMPANY, PLAINTIFF-APPELLANT,
v.
BOROUGH OF SOUTH PLAINFIELD, DEFENDANT-RESPONDENT AND DIVISION OF TAX APPEALS, IN THE DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 12, 1967.
Decided June 26, 1967.
*457 Before Judges GOLDMANN, KILKENNY and COLLESTER.
*458 Mr. Richard M. Goldman argued the cause for appellant (Messrs. Stein, Bliablias and Goldman, attorneys).
Mr. Harman R. Clark, Jr. argued the cause for respondent, Borough of South Plainfield.
Mr. Arthur J. Sills, Attorney General of New Jersey, attorney for respondent, Division of Tax Appeals, filed a statement in lieu of brief (Mr. Elias Abelson, Deputy Attorney General, of counsel).
The opinion of the court was delivered by KILKENNY, J.A.D.
Mead Johnson and Company, a corporation of the State of Indiana, hereinafter "Mead Johnson," appeals from two judgments of the State Division of Tax Appeals. The first affirms an omitted tax assessment of $300,000 for 1964 made by the Borough of South Plainfield on personal property of Mead Johnson stored in a warehouse in that borough. The second affirms a tax assessment (not omitted) of $33,309 for 1965 on Mead Johnson's goods similarly stored in the same warehouse. Both judgments denied Mead Johnson's claims that the merchandise was stored in a public warehouse and was, therefore, exempt from taxation under R.S. 54:4-3.20.
R.S. 54:4-3.20 provides:
"All personal property stored in a warehouse of any person, copartnership or corporation engaged in the business of storing goods for hire shall be exempt from taxation under this chapter."
The statute was enacted "to place our public warehouses on an equal competitive footing with those of our neighboring states where no personal property taxes were imposed." General Electric Co. v. City of Passaic, 28 N.J. 499, 505 (1958). Its constitutionality has been sustained and it has been applied in many reported decisions. Ibid. The warehouse exemption, originally adopted in 1925, "was based on *459 the legislative policy to further the common good by encouraging the development of New Jersey's warehouse industry". Id., at p. 509. It was anticipated that "any loss of taxes in the State of New Jersey would be more than offset by the increase of taxable property of New Jersey warehousemen resulting from their growth." Ibid.
There is no issue herein as to the storage of Mead Johnson's goods in the particular warehouse at 3605 Park Avenue, corner of Oak Tree Road, during the periods involved, or as to the value of the personal property, which consists essentially of medically prescribed food articles. As the Division properly observed, the sole question for decision is whether or not under all of the circumstances the personal property was stored in a warehouse within the meaning of the statutory exemption. The Division concluded that as between Mead Johnson and the operator of the warehouse, Oak Tree Distributors, Inc., the latter was not acting as a "warehouseman." It determined that "this warehouse is operated principally for the private convenience of Mead Johnson." On that finding, the tax exemption was denied.
Mead Johnson owned this warehouse and operated it through its own employees and for its own purposes until 1961 when, in furtherance of a change in company policy discontinuing its own warehouse operations throughout the country, it sold this warehouse in a bona fide sale for $275,000 to Nat Singer. Singer had stored products of Mead Johnson for many years prior thereto in his public warehouse in the Bronx, New York. Title was taken in the name of S.F. Investors, Inc., a New Jersey corporation organized by Singer and composed of members of his family and his New York attorney. The "S" and "F" in the corporate name represent the initials of Singer's children, Shirley and Fred. The deal involved a payment of 10% in cash and a 15-year purchase money mortgage for the balance, with interest at 4 1/4% and annual amortization of 4%.
The agreement of sale between Mead Johnson and Singer provided that for a period of one year commencing May 1, *460 1961 Singer would furnish Mead Johnson with all warehousing and distribution services for its products at such location, including as incidental thereto other necessary and connected services, such as mailing and invoicing services which it might require. Singer was to charge for all services and Mead Johnson was to pay therefor "cost, plus 5% thereof." It was further agreed that similar services would be furnished for a further period of two years commencing on May 1, 1962 "at your cost, plus 5%." The agreement also provided that "at any time during the said two year period either party may terminate such arrangement upon giving to the other party ninety days' written notice of such termination."
Singer formed another New Jersey corporation, Oak Tree Distributors, Inc., hereinafter "Oak Tree," similarly composed of members of his family and his New York attorney, to operate the warehouse as a tenant of the title owner, S.F. Investors, Inc. "Oak Tree" in this corporation's name was derived from the fact that the warehouse was at the corner of Oak Tree Road. There was no inter-corporate relationship between Mead Johnson and any of Singer's corporations. Neither had any stock or financial interest in the other. Except for the purchase money mortgage and its rights of storage under the agreement of April 26, 1961  limited to the periods specified therein  Mead Johnson had no rights in any of Singer's corporations or to store its goods in the South Plainfield warehouse. Its continued presence there to the present time on the same terms is at will only and terminable at any time by either party.
Mead Johnson occupies about 90% of the space in this warehouse. Oak Tree has about a dozen other well-known customers who store their goods in the remaining space. There is no actual separation of space as between Mead Johnson and the other customers. As goods come in from any customer they are stored in whatever space is then available. The operation is that of a modern distribution warehouse, as contrasted with the old dead-storage type. The *461 products and goods of the storers come in by carrier in large shipments and frequently move out in smaller quantities.
When Oak Tree took over the operation of this warehouse it engaged as its employees many of the personnel previously on the Mead Johnson payroll. It did so in order to avoid any problems with the labor union and to satisfy its own need for trained help. Full control of the warehouse operation, however, has been and is in the Singer corporations. Only Oak Tree employees perform the required services at the warehouse. No Mead Johnson employee functions there. At the beginning Oak Tree rented the office equipment which Mead Johnson had at the warehouse, until it subsequently acquired it by purchase. The only link Mead Johnson has with the warehouse, beyond the storage of its products there and its orders from time to time for release thereof, is a telephone listed in its name. Only Oak Tree employees answer this phone. Its principal use is for emergency orders from hospitals and doctors for Mead Johnson products. It was testified that this is not an unusual service in distribution warehouses.
The services rendered by Oak Tree for Mead Johnson are equally available to its other customers. While Mead Johnson is its principal customer, Nat Singer testified that he is constantly soliciting other customers by "belonging to and attending different clubs and meetings and trade functions, getting around meeting people and seeing people, golf outings, trophies, so on." The storage charges to Mead Johnson are calculated by taking the total operating expenses, deducting therefrom 60% of the income from other storers, and adding to the balance 5%. By this method Mead Johnson pays for its storage and related services a sum comparable to the rate per hundredweight charged to Oak Tree's other customers and generally by warehouses in northern New Jersey. This cost-plus method of paying for storage is similarly employed by Mead Johnson in its dealings with other public warehousemen.
*462 Oak Tree issues warehouse receipts to most of its other customers, but it follows a different method with Mead Johnson. It uses as a warehouse receipt "a photostated bill of lading which is already signed by the carrier." As Singer explained it, Mead Johnson sends to the warehouse a form or notice of "inbound" merchandise in advance of delivery. When the goods arrive, the truckman brings his bill of lading to the office. The inbound notice is compared to the bill of lading and, if everything checks out, the carrier is assigned a door or loading dock. The merchandise is unloaded on pallets and placed in storage. The warehouseman then signs the bill of lading, noting any exceptions. The signed bill of lading is used "in lieu of a warehouse receipt." This same procedure is followed in the case of some of Oak Tree's other customers.
Gene A. McDowell, the only other witness besides Singer, testified as distribution manager of Mead Johnson that the bill of lading consigning the merchandise to Mead Johnson in care of the public warehouse was a self-protective measure to avoid any question that title to the merchandise had passed out of the company. By the warehouseman's receipting for the merchandise, "he has accepted the liability as applicable to the bailee-bailor situation," according to McDowell. At least, that was the intended relationship between Mead Johnson and Oak Tree. He corroborated that the rates charged by Oak Tree are comparable to the rates charged by other warehousemen in the northern part of New Jersey; that Mead Johnson has no control over the goods while they are at the warehouse, other than to direct where they are to go; and that Mead Johnson has no employees at Oak Tree. Exemption had not been claimed for prior years because Mead Johnson was unaware then of the exemption statute.
The State Division of Tax Appeals, in denying exemption under R.S. 54:4-3.20, characterized the relationship between Mead Johnson and Oak Tree as more nearly approximating *463 that of principal and agent than that of warehouseman and customer. In its words:
"The financial relationship mortgagor-mortgagee, the long business relationship, the special services supplied to this customer, the cost plus compensation arrangement, the sharing of revenues from other customers, the dominant position of Mead Johnson among all customers  all of these factors taken together, no one of which is sufficient by itself, lead us to the conclusion that this warehouse is operated principally for the private convenience of Mead Johnson, and exemption must be denied."
Reliance was placed on General Electric Co. v. City of Passaic, 28 N.J. 499 (1958).
The only other case cited by the Division in support of its conclusions was Jersey City v. Liggett & Myers Tobacco Company, 14 N.J. 112 (1953). That case is factually distinguishable. There, the taxpayer leased definite space in a warehouse, supplied its own employees, and the warehouseman had no control over, access to, or responsibility for the stored goods. This was obviously a landlord-tenant relationship, and was held to "exclude the bailor-bailee relationship and substitute an entirely different relationship outside the statutory exemption." At p. 115. The instant case is a far cry from that situation. Here we have the ordinary delivery of goods to a public warehouseman, for redelivery to the owner when called for. That constitutes a bailment, as the Liggett & Myers case recognized. 14 N.J., at p. 115.
In General Electric Co., supra, the State Division of Tax Appeals had held that the goods of the manufacturer stored in a warehouse were entitled to a tax exemption under R.S. 54:4-3.20, even though 99% of the approximately 100,000 square feet of warehouse space was occupied by the products of the General Electric Co. Because the record on review contained but little on the issue whether the warehouse was operated as a bona fide public warehouse, or as a business convenience for the manufacturer, the Supreme Court reversed and remanded the cause to permit a full exploration of the activities engaged in by the warehouse company.
*464 That case was factually much weaker than the case sub judice. General Electric Co. there had an inspector at the warehouse to check each unit immediately prior to its shipment to the customer. It sent its employees from time to time to the warehouse to adjust or alter units to conform with newly adopted designs. No warehouse receipts were used, but an I.B.M. card system was employed to record the units received and released by the warehouse company. The record was silent as to what activities, if any, the warehouseman engaged in towards soliciting warehouse business from the public generally. So, too, it did not indicate how the storage rates charged to General Electric Co. compared with storage rates charged by public warehouses in the Passaic area or elsewhere in northern New Jersey.
The test of exemption or not was expressed as follows in the General Electric Co. case:
"If the taxpayer stores its property in a well-established or newly created public warehouse, genuinely operated as such, it is entitled to the benefit of the statutory exemption. * * * On the other hand, if it stores its property in a warehouse created or operated for its own private convenience and not genuinely operated as a public warehouse, then the statutory objective is not being served and no justifiable basis exists for favoring such personal property as against personal property stored at premises of taxpayer generally." 28 N.J., at p. 513.
In a concurring opinion, Justice Heher expressed the view that "the issuance of warehouse receipts is not determinative of the legal existence of a warehouse." At p. 517. He also stated that it cannot matter "whether the particular warehouse has at a given time, one, two or three, or several or many customers." Ibid.
In Halligan & McLellan, Inc. v. State Board of Tax Appeals, 122 N.J.L. 551 (Sup. Ct. 1939), lumber stored upon the premises of a warehouse company engaged in the business of storing goods for hire was held to be tax-exempt under the statute, even though the warehouseman did not ordinarily issue warehouse receipts for lumber, but did so only as the occasion warranted, as for instance where deposited *465 with a bank as security for a collateral loan. The court ruled that the issuance of a warehouse receipt was not essential to bring the transaction within the statute. So, too, in the instant case, the use of a bill of lading by which Mead Johnson consigned the goods to itself and Oak Tree's receipt for the goods did not derogate from a bailment of the goods or from Oak Tree's status as a warehouseman, as defined in the exemption statute and in R.S. 57:1-1 et seq., the Warehouse Receipts Law.
In City of Newark v. Weyerhaeuser Timber Co., 18 N.J. Misc. 560, 15 A.2d 224 (1940), the State Board of Tax Appeals held that property stored by a merchandising company in a public warehouse for hire was exempt from taxation under R.S. 54:4-3.20, where such warehouse is operated by a corporation actually engaged in the business of public warehousing generally, and this despite the fact that said corporation is a wholly-owned subsidiary of the taxpayer, occupying the same premises formerly occupied by the taxpayer. That decision went so far as to hold that the State Board may not deny the statutory exemption upon the sole ground that the taxpayer contrived the organization of the warehouse company in order to avoid taxation of the stored property. There is no suggestion in the instant case that Oak Tree is a subsidiary of Mead Johnson or that it was contrived by Mead Johnson to avoid taxation. Thus, the facts herein make a stronger case for tax exemption.
In Dearborn Chemical Co. v. Division of Tax Appeals, 135 N.J.L. 580 (Sup. Ct. 1947), the chemical products of a foreign corporation stored in a public warehouse in New Jersey were held to be tax-exempt under R.S. 54:4-3.20, even though the owner of the goods had certain of its own employees on duty at its space in the warehouse. This did not operate to destroy the relationship of bailor and bailee between the storer of the goods and the warehouse company, an independent corporation of New Jersey having no connection by way of ownership or management with the owner of the chemical products. Again, the facts herein make a *466 stronger case for tax exemption, Mead Johnson not having had any of its employees at Oak Tree's warehouse.
The applicable legal principles present no difficulty. The right to the claimed statutory exemption depends entirely upon the facts and circumstances of each particular case. The bases relied upon by the State Division for denying tax exemption herein are not valid. The sale of this warehouse by Mead Johnson to Singer's corporation was a bona fide business transaction and the seller's taking back of a purchase money mortgage does not affect Oak Tree's status as a public warehouseman. Nor does the long business relationship between Mead Johnson and Singer  as customer and warehouseman  prove anything other than that they found mutual satisfaction in their dealings with each other. The services rendered to Mead Johnson were no different from those available to other customers of this general distribution warehouse. The cost-plus arrangement was that customarily employed by Mead Johnson in its dealings with other public warehouses and produced for Oak Tree a resulting rate in substantial conformity with that charged its other customers. Mead Johnson was Oak Tree's biggest and most important customer, but Mead Johnson had no exclusive right to any part of this warehouse or any financial interest therein. Its position there depended upon its willingness to continue to use it and Oak Tree's and Singer's willingness to allow it to do so.
We are mindful of the limited scope of our appellate review of determinations of administrative agencies. We may not substitute our independent judgment for that of the board or agency where its findings are supported by substantial evidence, i.e., such evidence as a reasonable mind might accept as adequate to support a conclusion. In re Public Service Electric and Gas Co., 35 N.J. 358, 376 (1961). So, too, it is not our function to weigh the evidence, to determine the credibility of witnesses, to draw inferences and conclusions from the evidence and to resolve conflicts *467 therein. Hornauer v. Division of Alcoholic Beverage Control, 40 N.J. Super. 501, 504 (App. Div. 1956).
But in this case there are no conflicts to be resolved and there is no issue as to the credibility of the only two witnesses who testified and whose testimony stands unimpeached. In brief, the conclusion of the State Division is not based upon substantial evidence, adequate to support it. On the contrary, the proofs herein lead us to conclude that Mead Johnson's claims to personal property tax exemption for 1964 and 1965, by reason of R.S. 54:4-3.20, should have been allowed.
The two judgments of the State Division of Tax Appeals under review are reversed and the assessments are set aside.