109 N.J. Super. 475 (1970)
263 A.2d 803
CATHOLIC CHARITIES OF THE DIOCESE OF CAMDEN, PETITIONER-RESPONDENT,
v.
CITY OF PLEASANTVILLE, RESPONDENT-APPELLANT, and DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 16, 1970.
Decided April 7, 1970.
*478 Before Judges GOLDMANN, LEWIS and MATTHEWS.
Mr. Lawrence S. Berger argued the cause for appellant (Messrs. Lasser, Lasser, Sarokin & Hochman, attorneys; Mr. Sheppard A. Guryan, on the brief).
Mr. Martin F. McKernan argued the cause for respondent Catholic Charities of the Diocese of Camden.
Mr. Arthur J. Sills, Attorney General of New Jersey, attorney for respondent Division of Tax Appeals (Mr. Charles H. Landesman, Deputy Attorney General, of counsel), filed Statement in Lieu of Brief.
The opinion of the court was delivered by LEWIS, J.A.D.
Respondent City of Pleasantville (herein city) appeals from a final judgment of the Division of Tax Appeals (herein Division). That agency reversed a decision of the Atlantic County Board of Taxation which sustained a 1967 local tax assessment on property of petitioner Catholic Charities of the Diocese of Camden (herein Catholic Charities). The Division also allowed an exemption for the tax year 1968, notwithstanding the failure of Catholic Charities to file an appeal from an assessment for that year. The determinations of the Division as to both years are challenged.

THE 1967 ASSESSMENT
The subject property, formerly the Glen Dale Nursing Home  a proprietary institution  was acquired by Catholic Charities in early 1966. After extensive renovations the *479 new owner reopened the home under the name of Our Lady's Residence (herein Residence) and filed with the city assessor, pursuant to N.J.S.A. 54:4-3.6, an initial statement claiming exemption from taxation for 1967 on the grounds of religious and charitable use. There are no contentions concerning either the quantum of the assessment or the adequacy of the land for exemption purposes.
The following significant facts are undisputed. Catholic Charities was incorporated in 1940 under legislation entitled "An Act to Incorporate Associations not for Pecuniary Profit" (see N.J.S.A. 15:1-1 et seq.). The certificate of incorporation states: "The purpose for which this Corporation is formed shall be for religious and charitable purposes and for the moral, mental and physical improvement of men, women and children."
Residence, operated under the aegis of the Diocese of Camden, is situated in Pleasantville on approximately five acres of land. The property was purchased by Catholic Charities for $731,400. The equipment, furnishings and renovations increased that total cost to approximately $804,450, which was financed by loans from the Diocese on a "religious financing" basis, i.e., there was "no formal drawing up of notes."
The facility is used exclusively as a nursing home for the care of the aged, ill, infirm and convalescent. It has 106 beds and is maintained by 82 employees, including 15 registered nurses, 4 licensed practical nurses and 40 nurses' aides. At the time of the hearing $90 a week was the highest rate established for incoming patients. The charge to welfare and medicare patients was less than that amount. According to the testimony of Father Herron, the assistant director of Catholic Charities, approximately 80 of the 106 occupants were welfare patients, 31 were classified as total care, ranging from complete senility to paralyzation, 4 were intensive care patients and 51 were wheel-chair cases. Owing to the admission of patients with cancer or other terminal illnesses, there were 34 deaths during the preceding year.
*480 Father Herron further testified, in substance, that all people, regardless of race, creed, color or ability to pay, are acceptable at Residence, and that, in fact, it seeks generally to admit the economically disadvantaged and those receiving public assistance or welfare, and especially those who are ill. To the extent necessary, it is subsidized by the charity of its parent organization, the Diocese of Camden.
The city produced as a witness Jerry Godard, owner and administrator of the Golden Crest Nursing Home, a proprietary institution located in Atlantic City. That home has 208 beds, 115 employees, 8 registered nurses and 7 licensed nurses. Their rates range from $125 to $140 per week, plus additional charges for special services such as hand-feeding and therapy treatments. Godard's testimony accentuated the contrasting differences between the nonprofit functions of Residence and the profit motives underlying the operations of a proprietary nursing home. He testified, "We're supposed to be profit making" and that the institution was 85% occupied, with approximately 50% welfare patients. We note this testimony under cross-examination:
Q. And do you take Welfare patients, initially as Welfare patients?
A. On occasion, we take Welfare patients, but in most cases, they are patients that were private patients or Medicare patients, and they became Welfare patients, and sometimes we take a Welfare patient in, in an emergency, if we have a bed open.
Q. But it is your practice to avoid, if possible, just taking, initially, people who are Welfare patients?
A. It isn't our practice at all.
If we have beds available, we will admit them, but we don't solicit them.
The Division, after analyzing the proofs, found that Residence was a nonprofit organization which welcomes welfare and distress cases "for themselves," and not for the purpose of keeping their beds occupied, "as do private homes." It also noted that, at Residence, "the more helpless the patient, the more welcome he is," and that compared *481 with other nursing homes the rates charged were generally less, while the wages paid for maintenance and care were higher. Although not a hospital, since it was not confined exclusively to the care of the sick, the institution was held to be qualified as a charity within the intendment of the statute.
Implicit in the opinion of the Division are findings that Residence performs a charitable function that benefits the public-at-large inasmuch as the burden of taxation is lessened by obviating the necessity on the part of government to construct facilities to accommodate the poor who are unacceptable to or who cannot afford the rates charged by nursing homes operating for profit. The Division observed, "It is quite obvious that the basis of * * * Residence's concern is what service it can render without regard to profit whereas no home operated for profit could afford to do this," and concluded:
* * * This home is apparently willing to take people not sought by profit-making institutions. We feel that there is a demand in this community, as a matter of fact in any community, for some institution to engage in the operation of a nursing home without regard to the profit motive. We feel that the Diocese of Camden by reason of its concern for the welfare of people through the Catholic Charities established such a non-profit institution. We feel that this exemplifies "charity" in the best sense of the word and comes within any proper legal definition of the word "charity." We do not think that the nursing home field should be left to profit making organizations only any more than we believe that the hospital field should be the sole preserve of profit making institutions. Accordingly we hold the home tax exempt.
Here the city argues (1) the exemption statute, N.J.S.A. 54:4-3.6, requires that property be used exclusively for charitable purposes if the owner thereof is to avoid paying its fair share of real estate taxes, and (2) the exemption claim is fraught with doubt.
The latest decisional pronouncements of our Supreme Court in dealing with the interpretation of N.J.S.A. *482 54:4-3.6 are set forth in The Presbyterian Homes of the Synod of New Jersey v. Division of Tax Appeals, 55 N.J. 275 (1970). There it was held that Meadow Lakes Village, a retirement enterprise owned and operated by petitioner-appellant, was not entitled to tax exemption. That decision was rendered shortly prior to the scheduled argument on this appeal. Acocrdingly, we requested counsel to file supplemental briefs and to address their arguments to its applicability to the instant case. We have had the benefit of their respective views.
A brief summary of the crucial facts in Presbyterian Homes is in order. Tax exemption was sought by petitioner for Meadow Lakes, consisting of 103 acres with 23 apartment buildings representing 211 living units, most of which were garden-type apartments. The complex embraced a variety of recreational facilities and a medical health center. It was nondenominational and was not organized for profit. The total staff of employees numbered 207, of whom 11 were registered nurses.
The cost of the project exceeded $12,000,000, of which $4,450,000 was provided by "founders fees" paid by the original residents; the balance was raised by a loan from the Presbyterian Homes' endowment fund and a federal grant. All residents are required to pay a founder's fee for the lifetime use of their respective apartments. The fees ranged from $12,000 to $43,000, in addition to which each resident paid for maintenance $205-$360 per month, depending upon the type of accommodations; notwithstanding these charges the operational expenses substantially exceeded income. Moreover, the residents were required to sign an agreement relating to privileges, obligations and petitioner's termination rights.
As stated by the court, Meadow Lakes provided luxurious retirement facilities to those who were able to pay. In concluding that petitioner was not entitled to the relief sought, either as a hospital or a charity, the court stated, "We fail to see how any invidious discrimination would arise if, as *483 petitioner described itself in a brochure, Meadow Lakes with its `gracious retirement living,' is denied tax-exempt status." 55 N.J., at 290.
It is at once apparent, without need for emphasis or focusing discussion, that the factual situation in Presbyterian Homes is manifestly distinguishable. In following the teachings of that case and the authorities approvingly cited therein, we examined the instant record bearing in mind, in particular, these stated guidelines: property should ordinarily bear its just and equal burden of taxation; whether it is devoted to charitable purposes depends upon its use and the facts and circumstances of each case; in a legal sense the term "charity" is a matter of description rather than a precise definition; exclusiveness is tested by the organization's purpose and the actual use of its property; care for aged people in need is a proper concern of government; justification for an exemption from taxation ordinarily involves a charitable service which would be undertaken at public expense if not made available by private parties; profit is a factor for consideration, but is not necessarily controlling since nonprofit status "cannot be equated with charitableness," and the ultimate cost to the patient, in light of his need, the facilities available to satisfy that need and the type of services rendered, is an element which may support or negate a charitable purpose. 55 N.J., at 283-288.
Thus considered, and applying those legal concepts to the facts before us, we are satisfied that the Division's determination in favor of the tax exemption sought by Catholic Charities for the year 1967 was not arbitrary, capricious or unreasonable, but was predicated upon substantial and credible evidence in the record. It should therefore be affirmed. Mead Johnson and Co. v. Borough of South Plainfield, 95 N.J. Super. 455, 466-467 (App. Div. 1967); In re Sanders, 40 N.J. Super. 477, 483 (App. Div. 1956); cf. Jackson v. Concord Company, 54 N.J. 113, 117-118 (1969).

*484 THE 1968 ASSESSMENT
The city argues that irrespective of the resolution of the 1967 exemption claim, Residence is taxable for the year 1968 since the owner did not file an appeal from the assessment for that year. This argument is bottomed upon the legislative fiat of N.J.S.A. 54:3-21 requiring a "taxpayer aggrieved" to file an appeal to the county board of taxation prior to August 15 of the taxable year. The issue was first raised by Catholic Charities when, during the hearing before the Division, it made an oral motion seeking a ruling as to whether the exemption, if granted for 1967, would continue for the year 1968. In reaching a decision in favor of movant the Division relied upon N.J.S.A. 54:4-4.4, which provides that "Every municipal tax assessor shall * * * obtain from each owner of real property in his taxing district, for which a tax exemption is claimed, an initial statement under oath * * *. When an initial statement has theretofore been filed, then * * * thereafter not later than November 1 of every third succeeding year, said assessor shall obtain a further statement * * *." (Emphasis added.)
The statute also provides that each assessor
* * * may at any time inquire into the right of a claimant to the continuance of an exemption hereunder and for that purpose he may require the filing of a further statement or the submission of such proof as he shall deem necessary to determine the right of the claimant to continuance of the exemption. Such further statement shall be in such form as shall be prescribed by the director and shall set forth.
(a) Whether there has been any change of use of any such property initially determined as being entitled to exemption during any 3-year-period as aforesaid which would defeat the right of exemption therein, and
(b) Whether any new or additional property has been acquired for which a tax exemption is claimed * * *.
In articulating the scope of the exemption the Division expressed the view that the Legislature intended that the exemption status should be preserved for a period of three *485 years from the filing of the initial statement unless the assessor required a further statement. It decided, however, that the municipality, in the circumstances, should not be foreclosed from producing additional facts to indicate that the 1967 exemption should not be continued. Accordingly, the city was permitted 30 days within which to produce evidence as to any factual changes bearing upon the asserted exemption for the succeeding year. After a supplemental hearing, it was determined that the 1967 exemption extended through the year 1968.
It is fundamental that statutes in pari materia are to be construed together as a "unitary and harmonious whole, in order that each may be fully effective." City of Clifton v. Passaic County Board of Taxation, 28 N.J. 411, 421 (1958). When there is conflict, the interpretive function of the judiciary is to resolve the discord to conform to the spirit of the legislation as a whole. Ibid.; cf. County of Gloucester, Board of Chosen Freeholders v. Pub. Emp. Rel. Comm., 107 N.J. Super. 150, 156 (App. Div. 1969), aff'd 55 N.J. 333 (1970). It is equally clear that when uncertainties or ambiguities exist it is appropriate for the court, in order to ascertain legislative intent, to examine the history of the enactments, including any statements attached to the bills which were enacted into law. See Bass v. Allen Home Improvement Co., 8 N.J. 219, 224 (1951); Brewer v. Porch, 53 N.J. 167, 174 (1969). This we have done.
The pertinent section of N.J.S.A. 54:3-21 has been on our books since 1918 with relatively no change in substance and no historic explication, L. 1918, c. 236, § 701, p. 879; amended L. 1933, c. 266, § 12, p. 712, and L. 1945, c. 125, § 1, p. 479 which merely provided for the filing of a copy of an appeal petition with the municipality's assessor, clerk or attorney.
N.J.S.A. 54:4-4.4 came into existence much later. L. 1951, c. 135, § 1, p. 570. The last amendment, L. 1954, c. 102, § 1, p. 573, was fathered by Senate Bill No. 171, which had attached thereto a statement reading:
*486 This bill is designed to require property owners claiming tax exemption to file a "further statement" with the local assessor every 3 years instead of annually, as at present.
Under existing law (P.L. 1951, c. 135), "further statements" showing changes in use of exempt property and new property acquisitions for which exemption is claimed, must be filed annually. Since the vast majority of properties for which exemption has been claimed indicate no change from year to year, the annual filing of a "further statement" entails an unnecessary requirement on the part of exemption claimants. The 3-year requirement is believed to be adequate to apprise assessors of all pertinent changes. The date for filing initial and further statements has been changed from October 1 to November 1, to conform to existing practice in handling applications for exemption.
It is manifest that the statute anticipates a three-year period during which a filed exemption statement has vitality subject to further inquiry by the local assessor. See Blair Academy v. Township of Blairstown, 95 N.J. Super. 583, 591 (App. Div.), certif. den. 50 N.J. 293 (1967). Compare the so-called "Freeze Act," N.J.S.A. 54:2-43. The municipality having contested the exemption, it was aware that a resolution of the controversy would determine the taxing status of Residence, present and in futuro, subject to changes in the law or in the existent structure and its use.
While Catholic Charities might have filed a 1968 tax exemption form, ex abundanti cautela, as it did for the year 1969, it would appear inequitable and unnecessarily technical to hold that it had no right to assume that its 1967 initial exemption statement would be viable for a three-year period. If Residence had been found to be taxable for 1967, taxes for subsequent years would be due as a matter of course. Contrariwise, since we determine that Residence is a charity and entitled to tax exemption for 1967, to sustain the 1968 assessment, in light of the applicable statutes, would unduly strain legislative language and emphasize form over substance.
Statutes establishing a procedure for setting aside assessments are liberally construed in the interests of equality and uniformity. 3 Sutherland, Statutory Construction (3d *487 ed. 1943), § 6707, at 304-305. Thus, a final determination of a right to exemption for 1967 should carry with it the concomitant legislative three-year exemption from taxation.
Exemption from taxation has been viewed as a vested right. See the dissenting opinion of Justice Van Syckel, Moore v. State, 43 N.J.L. 203, 243 (E. & A. 1881). Note, WHYY v. Borough of Glassboro, 393 U.S. 117, 89 S.Ct. 286, 21 L.Ed.2d 242 (1968); cf. City of East Orange v. Palmer, 47 N.J. 307, 314-316 (1966). See generally 16 McQuillin, Municipal Corporations (3d ed. rev. 1963), "Taxation," § 44.85, at 273-278. N.J.S.A. 54:3-21, relied upon by the city, should not be construed so as to obliterate a right to exemption "unless that intention is made manifest by language so plain and unmistakable that there is no possibility of any choice of meanings." McCaffrey, Statutory Construction, § 67, at 136 (1953); 2 Cooley's Constitutional Limitations (8th ed. 1927), at 745. Accord, Morin v. Becker, 6 N.J. 457, 470 (1951).
Moreover, the revocation of an exemption may have retroactive application to tax years in which no tax was paid. Automobile Club of Mich. v. Commissioner of Int. Rev., 230 F.2d 585 (6 Cir.1956), aff'd 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746, reh. den. 353 U.S. 989, 77 S.Ct. 1279, 1 L.Ed.2d 1147 (1957). Hence, a determination that a property is not exempt would be conclusive regarding later years where there has been no change of facts. Ridgewood Elks Holding Corp. v. Village of Ridgewood, 127 N.J.L. 295, 298 (E. & A. 1941); cf. Blair Academy v. Township of Blairstown, supra, 95 N.J. Super., at 591. We view the converse of these principles to be applicable in the instant matter. See Erskine v. Van Arsdale, 82 U.S. (15 Wall.) 75, 21 L.Ed. 63, 63-64 (1872). Compare Tuttle v. Everett, 51 Miss. 27, 24 Am. Rep. 622 (Sup. Ct. 1875).
The frequently quoted expression, "Men must turn square corners when they deal with the Government," Rock Island, Arkansas & Louisiana Ry. Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920), is no more *488 persuasive and forceful than its corollary, "government ought to turn square corners when dealing with its citizens." Howbert v. Penrose, 38 F.2d 577, 581 (10 Cir.1930). See Maguire & Zimet, "Hobson's Choice and Similar Practices in Federal Taxation," 48 Harv. L. Rev. 1281 (1935).
The judgment of the Division is affirmed.