LASSER, P.J.T.C.
Taxpayer seeks exemption from 1981 local property taxation of its nursing and retirement facility in Dover, New Jersey, pursuant to the provisions of N.J.S.A. 54:4-3.6. The property, known as Block 1311, Lots 7, 8, 11 & 12, and located at 69-73 North Sussex Street and 72 and 76 Pequannock Street in Dover, is assessed for tax year 1981 as follows:
Block 1311
Land
Improvements
Total
Lot 7
$ 25,000
136,300
$161,300
Lot 8
$ 31,500
700,000
$731,500
Lot 11
$10,000
800
$10,800
Lot 12
$10,000
1,700
$11,700
Taxpayer does not challenge the amount of the assessments if tax exempt status is not granted. The Morris County Board of Taxation denied tax exemption to taxpayer and affirmed the 1981 assessments.
Taxpayer, Christian Research Institute, Inc. (hereinafter CRI) is a Delaware corporation which operates the subject nursing *379 and retirement facility under the name Dover Christian Nursing Home (hereinafter DCNH). Dr. Walter R. Martin, president of taxpayer and an ordained minister of the Southern Baptist Convention, testified that he founded CRI in 1960 as a reaction to the growth of cultic and occultic groups. CRI’s purpose is to provide information in response to attacks on Christianity by such groups and to promulgate the Gospel of Jesus Christ by the dissemination of information in the form of literature, seminars, lectures, cassettes and a call-in radio program. CRI was originally founded in New Jersey and remained in New Jersey from 1960 until 1973 when it moved to California.
CRI was recognized as an exempt organization by the Internal Revenue Service in a 1964 letter ruling and files a Form 990 income tax return as a non-profit organization. The corporation is authorized to act in New Jersey, California and Florida. There was testimony that, as a non-profit corporation, CRI pays no corporate taxes in these states and that CRI has a sales tax exemption in New Jersey.
Martin is an employee of CRI and receives an annual salary of $15,000. There are 16 or 17 CRI employees in California in addition to those employed in the operation of DCNH in New Jersey.
Martin stated that it was difficult to fund religious organizations dedicated to the dissemination of information. From discussions with a member of the board of CRI who operated nursing homes, Martin concluded that the religious work of the corporation would be furthered by ministering to the aged in the hope that funds generated from this source would support the corporation’s activities in promulgating the Gospel of Jesus Christ. In 1970 CRI leased the subject property, formerly the Dutton Motor Hotel. In the same year the property was converted for use as a nursing and retirement home, and CRI began operating the property as the Dover Christian Nursing Home. In 1976 CRI purchased the property. The purchase was financed by loans personally guaranteed by Martin and members of the CRI Board of Trustees.
*380 Taxpayer’s witnesses testified to the following facts. The property consists of four separately assessed continguous parcels of land. Lot 8 contains the six-story nursing home, Lot 7 the two-story retirement center and Lots 11 and 12 the parking areas for both. The nursing home and the retirement center structures are connected by a lobby that straddles the lot line between Lots 7 and 8. The nursing home contains 44,693 square feet. Floors 2 through 6 each contain 15 rooms ranging in size from one-bed to four-bed rooms. The nursing home facility has a total of 125 beds. The retirement center contains 13,979 square feet. It has accommodations for 50 residents. For the fiscal years ended June 30,1980,1981 and 1982, occupancy of the nursing home averaged 99% and occupancy of the retirement center averaged 88%.
The nursing home provides skilled intermediate care for the patients’ physical needs and also provides them with spiritual support. The retirement center provides residential facilities and has some interaction with the nursing home. For example, a nurse is available to supervise the administering of medication to retirement center residents.
DCNH is open to all people without restriction for race, creed or color. A chaplain ministers to the religious needs of the residents but residents may choose to participate in religious activities with clergymen of other faiths. No one is denied the opportunity to live in the retirement center by reason of his religion.
Some nursing home patients are supported in part by medicare and medicaid payments from the federal and state governments. One nursing home patient does not pay the full daily rate because she has a lifetime contract.
Residents of the retirement center pay for their own maintenance. Three residents of the retirement center do not pay the full daily rate. One has a lifetime contract and two others are financially unable to pay the full daily rate.
In 1974, CRI discontinued its practice of entering into lifetime contracts under which a patient or resident turned over all *381 assets in exchange for lifetime care. Martin testified that no resident of DCNH will be expelled if he cannot continue maintenance payments. He stated that this would be contrary to the moral precepts of CRI.
Rates for nursing home patients and retirement center residents are based on budgeted costs and comparable rates charged by other nursing homes in the area. The nursing home has had three rate changes since 1980. The retirement center had one rate change in July 1981. Budgets are established each year to cover operating costs plus a contingency factor. Consideration is given to the desirability of providing funds for the CRI information ministry.
The nursing home is required by its contract with New Jersey to have at least 35% medicaid patients. DCNH has always had more than 35% medicaid patients. For the year ended June 1982, the cost of a long-term medicaid patient’s care was $48.22 per day. The nursing home received a medicaid payment of $46.49 per day or $1.73 less than the actual cost. The daily rate for private patients is adjusted to compensate for the shortfall in the medicaid daily rate. There was no testimony that a similar shortfall occurs with medicare patients. Five percent of the nursing home patients receive medicare payments and 50-60% receive medicaid payments.
For the fiscal years ended June 30, 1980, 1981 and 1982, $82,000, $89,000 and $97,595 of surplus funds were transferred from the DCNH operating accounts to the California CRI accounts for use by CRI in its information ministry. Each year the transferred funds exceeded the amount of the net profits of DCNH but were less than the gross cash flow produced by DCNH.
In 1980 DCNH used approximately $62,000 of its funds to investigate the feasibility of establishing a second nursing home in West Caldwell. This second nursing home project was abandoned in 1982. The $62,000 was charged to operating expenses.
*382 Taxpayer contends that the entire DCNH facility is exempt from real property taxation. N.J.S.A. 54:4-3.6 grants exemption from taxation to:
... all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children or for religious, charitable or hospital purposes or for one or moré such purposes. . .the land whereon any of the buildings hereinbefore mentioned are erected and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed five acres in extent...
... provided in case of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit, except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings; provided the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes.
In order to qualify as a tax exempt facility, the taxpayer must establish the following:
1. That CRI, as owner of the property and the operator of DCNH, is a non-profit corporation organized exclusively for the moral and mental improvement of men, women and children or for religious, charitable or hospital purposes.[1]
2. That the nursing home and retirement center building is actually and exclusively used for the moral and mental improvement of men, women and children or for religious, charitable or hospital purposes.
Tax exemption statutes are strongly construed against those claiming exemption because of the compelling public policy that all property bear its fair share of the burden of taxation. Princeton Univ. Press v. Princeton Boro., 35 N.J. 209, 172 A.2d 420 (1963). Consequently, taxpayer carries the burden of prov *383 ing entitlement to tax exemption. Ibid.; Jamouneau v. Div. of Tax Appeals, 2 N.J. 325, 66 A.2d 534 (1949).
From the certificate of incorporation dated April 11, 1960, I conclude that CRI is a non-profit corporation organized exclusively for the mental and moral improvement of men, women and children or for religious, charitable or hospital purposes, or for one or more such purposes. Taxpayer’s claim for exemption of the subject property is based on its claim that CRI is a “religious-charitable organization.” Resolution of the exemption claim depends on the nature of the operation of the subject property. It is not contended that the nursing home and retirement center is entitled to exemption as an organization operated for the mental and moral improvement of men, women and children, or as a hospital. DCNH is not a religious organization. The facts specifically show that every effort is made to operate it on a non-sectarian basis. Therefore, the principal issue is whether the subject property is actually and exclusively used for charitable purposes.
The term “charitable purpose” has been defined as a purpose “beneficial to the community,” Leeds v. Harrison, 9 N.J. 202, 87 A.2d 713 (1952) and as “relief to indigent persons,” Passaic United Hebrew Burial Assoc. v. United States, 216 F.Supp. 500 (D.N.J.1963). The term “charitable purposes,” as used in N.J. S.A. 54:4-3.6, was discussed in Presbyterian Homes v. Div. of Tax Appeals, 55 N.J. 275, 261 A.2d 143 (1970). In that case, the court was called on to decide whether a retirement center and nursing facility known as Meadow Lakes was operated for charitable purposes. After analyzing the definitions given the term “charitable” by courts of other states with similar statutes, the court concluded that the term was incapable of precise definition and stated:
. .. The determination of whether property is devoted to charitable purposes depends upon the facts or circumstances of each case. As a guide, however, it should be borne in mind that a sometimes stated justification for charitable tax exemptions is that if the charitable work were not being done by a private party, it would have to be undertaken at public expense, [at 285, 261 A.2d 143].
The court further stated that whether a home for the aged and infirm is operated for a charitable purpose will depend on *384 the manner in which the property is used to accomplish that end. Id. at 288, 261 A.2d 143. Meadow Lakes charged an initial “founder’s fee” to defray its long-term mortgage obligations and charged its residents a monthly fee to defray current costs. Each resident entered into a contract with Meadow Lakes in which Meadow Lakes reserved to itself the right to terminate the contract for any reason. Although residents who could no longer afford to pay full fees would be permitted to remain, neither the by-laws nor the corporate charter obligated Meadow Lakes to keep them.
In denying tax exemption to the center, the court found that the nature of the fees and rentals paid by residents negated a charitable purpose:
The residents... have purchased that which they are receiving; quid pro quo permeates the entire operation... Petitioner’s desire to develop a congenial environment for elderly persons, to plan social and recreational activities compatible with their ages and to provide a wide variety of services is to be commended. But they are all acts and services readily within the ability of any organization or even individuals to perform, [at 287-288],
Care for the aged was deemed a charitable purpose for tax exemption purposes in Catholic Charities, Dio. of Camden v. Pleasantville, 109 N.J.Super. 475, 263 A.2d 803 (App.Div.1970). Unlike the center in Presbyterian Homes, the nursing home in Catholic Charities charged fees substantially below those charged in comparable homes. Patients were admitted regardless of ability to pay, and nearly 80% of the patients were welfare patients. The home was subsidized by the Diocese of Camden and actively sought economically disadvantaged and welfare patients. In finding that the nursing home was devoted to charitable purposes, the court noted that care was rendered without regard to profit, and the burden of government to care for the poor was lessened by the existence of the facility. The court quoted the Division of Tax Appeals findings which said, in part, “We feel that this exemplifies ‘charity’ in the best sense of the word and comes within any proper legal definition of the word ‘charity’.” [109 N.J.Super. at 481, 263 A.2d 803.]
The subject nursing home was established by Christian Research Institute in the hope that it would earn a profit. Pa *385 tients are charged competitive rates and these rates are adjusted periodically to keep pace with industry rates. While approximately 55% of the patients are medicaid recipients, the nursing home is required by its contract with New Jersey to have at least 35% of its patient population consist of medicaid patients. The daily rate charged private patients is adjusted to compensate for the shortfall between the cost of the medicaid patients’ care and the medicaid reimbursement for their care. There are no medicaid or medicare recipients in the retirement center.
DCNH is not comparable to the Catholic Charities nursing home. It does not seek indigent patients, and there is no evidence that indigent patients would be admitted. While there was testimony that no patient would be expelled for lack of funds, there was no proof that CRI is obligated by its by-laws or corporate charter to retain such patients.
DCNH is not subsidized by CRI. It has consistently earned a profit, and that is its purpose. It is a means of funding CRI, not a means of shouldering the burden of caring for the needy elderly which otherwise would be borne by the government. Patients and residents bear the cost of operation and provide a profit to CRI. The relationship of CRI to the patients and residents is on a quid pro quo basis similar to the Meadow Lakes home in Presbyterian Homes. I find that DCNH, both the nursing home and the retirement center, are not “actually and exclusively used” for charitable purposes.
Taxpayer argues that even though DCNH earns a profit, that profit is used solely for the religious purposes for which CRI was organized and therefore DCNH is exempt.
In Princeton University Press v. Princeton, supra, Princeton University Press was denied property tax exemption even though it was a non-profit corporation devoted to the promotion of education and scholarship. The corporation published scholarly works but also engaged in printing work for other non-profit organizations in order to offset its losses. The court found that the land and buildings were not exclusively used for the mental and moral improvement of men, women and children *386 because the outside printing work took on the nature of a commercial enterprise. [35 N.J. at 216, 172 A.2d 420]. The fact that funds generated by the commercial activities of the Princeton University Press were used in furtherance of its educational activities did not render its property exempt from taxation, because both the purpose of the organization and the use of its property must be exclusively for the exempt purpose.
The fact that CRI may be a religious organization or that DCNH profits are used by it for religious purposes is not controlling. Qualification for exemption under § 3.6 depends on the use of the property, not the use of the funds generated by the property. DCNH property is not actually and exclusively used for religious or charitable purposes. I therefore conclude that the subject property is. not entitled to exemption from local property tax.
The Clerk of the Tax Court is directed to enter judgment denying exemption to and affirming the 1981 assessments on Block 1311, Lots 7, 8, 11 and 12.

CRI is a Delaware corporation qualified to do business in the State of New Jersey. The statutory requirement that the institute claiming exemption be organized under the laws of this state is no longer applicable. WHYY, Inc. v. Glassboro Boro., 393 U.S. 117, 89 S.Ct. 286, 21 L.Ed.2d 242 (1968).