LASSER, P.J.T.C.
Taxpayer, a nonprofit corporation, contests the 1988 real property tax assessment on low and moderate income multifamily affordable housing property owned by it and located at 197 Main Street, Peapack & Gladstone Borough, known as Block 22, Lot 6. Taxpayer seeks exemption for the property or, in the alternative, a reduction in the assessment on valuation grounds. The 1988 assessment in contest is:
[[Image here]]
A municipal-wide revaluation was adopted by the taxing district for the year 1988 at 100% of value. The 1988 assessment was affirmed by judgment of the Somerset County Board of Taxation.
I.
Taxpayer was formed to construct and operate senior-citizen apartment housing at reduced rates affordable to persons of low and moderate income for the benefit of members of St. Luke’s parish, the people of Peapack-Gladstone and their respective relatives. The funds for the construction of the *78 project came from the proceeds of two estates which were left to St. Luke’s Church and from pledges raised by the church.
The subject property consists of one detached single-family dwelling, built about 1906, which is used in conjunction with two detached multi-family dwellings built in 1987, all of which are located on a parcel of land 16,400 square feet (0.376 acres) in size. The property is used to house low and moderate income senior citizens, and occupancy began June 1, 1987.
Building no. 1 is a frame/vinyl-sided two-story colonial single-family dwelling containing 1,379 square feet. The first floor is used as a meeting area for residents of the facility and has a kitchen and a bath. There is a dwelling unit on the second floor. Building no. 2 is a frame/vinyl-sided two-story multifamily dwelling containing four dwelling units. Each unit is about 450 square feet in size and contains 2V2 rooms. The entire building contains a total of 2,946 square feet, of which 1,146 square feet is common area. Building no. 3 is a duplicate of building no. 2 and is located at the rear of building no. 2. The total facility contains nine dwelling units in a total of 7,271 square feet. As of September 1987, the cost of the land and improvements totalled $694,532.
The two newer buildings were constructed pursuant to a variance granted by the board of adjustment of the taxing district and site plan approval by the planning board. As required by these approvals, a deed was recorded which limited the occupancy of the buildings to persons of low or moderate income, 62 years of age or older, at rentals which are affordable by persons of low and moderate income as defined in So. Burlington Cty. NAACP v. Mount Laurel Tp., 92 N.J. 158, 456 A.2d 390 (1983) (Mount Laurel II). The deed states that “this covenant shall be for the benefit of the people of the Borough of Peapack & Gladstone and shall be enforceable by the officials of the municipality.” On May 17, 1988, the New Jersey Council on Affordable Housing informed the mayor that the subject property entitles the taxing district to nine units of credit toward the municipality’s fair share of low and moderate income housing. By letter of September 29, 1988 the Internal Revenue Service granted taxpayer federal income tax exemption under § 501(c)(3) of the Internal Revenue Code.
*79 II.
Taxpayer contends that it is entitled to exemption under N.J.S.A. 54:4-3.6 pursuant to City of Asbury Park v. Salvation Army, 26 N.J.Misc. 170, 58 A.2d 216 (Div.Tax App.1948) and Mount Laurel II, supra.
Eight of the nine apartments rent for $325 a month including utilities except electricity, and one apartment rents for $350 a month including all utilities. These rents are substantially less than the rents for equivalent unrestricted apartments in the taxing district. Each resident has a sponsor who guarantees payment of the monthly rent. No health care is provided.
As of 1988 the ages of the nine residents ranged from 71 to 88 years, with an average age of 78. The income of the residents ranged from $7,500 to $18,000 a year, with an average income of $14,216.
A resident in the subject property is required to deposit the sum of $15,000 to be held by taxpayer during the residency term. This sum is paid as a condition of entrance and may be used for any corporate purpose, but is fully refundable upon termination of the residency provided the apartment is left in good condition except for reasonable wear and tear. If a resident is unable to meet monthly charges, financial assistance will be sought first from the applicant’s sponsor; second, the resident will be assisted in seeking governmental assistance; third, St. Luke’s Village resources may be used; and fourth, other charitable sources may be used. If the financial shortfall cannot be satisfied, the resident will be asked to seek other housing.
The certificate of incorporation, as amended, provides that St. Luke’s Village, Inc. is organized exclusively for charitable or religious, educational and scientific purposes and that no part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its members, trustees, directors, officers or other private persons except for reasonable compensation for services rendered.
A review of the facts of this case leads to the conclusion that the subject property is not entitled to exemption from real *80 property taxation under N.J.S.A. 54:4-3.6. That statute provides exemption for “all buildings actually and exclusively used in the work of associations and corporations organized exclusively for religious or charitable purposes____” It is generally accepted that exemptions from local property taxation must be strictly construed because an exemption from taxation is a departure from the equitable principle that all taxpayers should bear their just and equal share of the public burden of taxation. Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961).
Taxpayer is organized exclusively for religious or charitable purposes. However, in addition to this, the statute requires that the property must be used actually and exclusively for religious or charitable purposes. No claim is made that the property is used for religious purposes, taxpayer’s claim for exemption being based on charitable use. Exemption for charitable purposes under the statute requires a finding that the use of the property is exclusively charitable. In the subject case, although the rents or fees charged the residents are less than market rents for the area, there remains a requirement of financial responsibility on the part of the residents. This is assured in part by a $15,000 refundable deposit and sponsorship by a person who will guarantee that the monthly rent is paid. A resident who is no longer able to pay the monthly rent is required to leave. There is no obligation on the part of taxpayer to assist a resident who is unable to pay the monthly rent. Further, a resident must be capable of living independently in order to continue as a resident. The foregoing facts lead to the conclusion that the property is not used exclusively for charitable purposes. See Presbyterian Homes v. Div. of Tax Appeals, 55 N.J. 275, 261 A.2d 143 (1970); Christian Research Institute v. Dover, 5 N.J.Tax 376 (Tax Ct.1983). Cf. Catholic Charities, Dio. of Camden v. Pleasantville, 109 N.J.Super. 475, 263 A.2d 803 (App.Div.1970), rev’d on other grounds 72 N.J. 389, 405, 371 A.2d 22 (1977).
Taxpayer’s reliance on Mount Laurel II, supra, is misplaced, as that case addresses neither taxation of Mount Laurel proper *81 ty nor its classification as a charitable use. Taxpayer relies on Asbury Park v. Salvation Army, supra, a 1948 Division of Tax Appeals opinion, in which the division granted exemption to a home for retired Salvation Army officers despite the fact that the officers were required to pay a fee based on the amount of their pension. The Salvation Army paid 60% of the operating costs of the home. The opinion is silent as to whether a resident would be required to leave if unable to pay the fee.
The standards for granting exemption for charitable use have been further clarified in recent years. In Presbyterian Homes, the New Jersey Supreme Court held that a luxury retirement community was not entitled to a charitable exemption. The Court considered: (1) that the community was not obligated to care for residents if they were unable to pay monthly charges, (2) the likelihood that the State would be required to care for residents whose residency was terminated, and (3) the nature of the fees, which included a substantial founder’s fee and monthly payments. However, in Catholic Charities, the Appellate Division granted exempt status to a nursing home which did not discriminate against patients based on their ability to pay, and where over half of the patients were on welfare and were paying lower rates than the other patients.
The furnishing of affordable housing to persons of low and moderate income is not charity where there is substantial security for their rental payment and where, as in the subject case, the residents pay substantially all of the operating expenses and if they are unable to pay, they must leave. The purpose of St. Luke’s Village, to provide affordable housing for low-and moderate-income persons, is a worthy one and its benefactors are to be applauded for their efforts; but, however meritorious this purpose, the manner in which St. Luke’s Village achieves this purpose does not constitute charitable use.
III.

The Valuation Issue.

Taxpayer’s appraisal expert valued the property by the sales comparison approach and estimated the value to be $193,000. *82 He rejected the income approach because the property is not a financially profitable enterprise and the restrictions placed upon the use of the property by the taxing district prevent a multifamily use other than as low- and moderate-income housing. This expert concluded that the highest and best use of the property would be achieved by the demolition of the two existing multi-family buildings containing a total of eight dwelling units and the reconversion of the original 1906 house to single-family use. This expert stated that he has not used the cost approach because he determined that the newer improvements had no value and to value the 1906 house by the cost approach would be highly speculative and unreliable because of its age.
This expert analyzed sales of four comparable single-family homes in Peapack & Gladstone occurring at about the October 1, 1987 assessment date. From his analysis of these sales he concluded that the subject single-family house would have an estimated market value of $205,000 before renovation of the house and demolition of the two newer buildings. He deducted $2,000 for renovation and $10,000 for demolition of the two newer multi-family dwellings and concluded that the value of the subject as of October 1, 1987 was $193,000.
The appraisal expert presented by the taxing district concluded that the highest and best use of the subject property was for residential purposes in a condominium-type of ownership. She used the cost approach, sales comparison approach and income approach in estimating her value of $972,000 for the property. In her sales comparison approach this expert considered the sales of the 14 condominium units in a converted brick retail building at the intersection of Main Street and Mendham Road, about 250 feet from the subject property. These units, which are larger in size, sold between May and August 1987 at prices ranging from $151,900 to $216,900. After adjusting for size, this expert concluded that the nine subject units would sell for $108,000 each, or a total of $972,000.
In her income approach this expert attributed an economic rent of $800 to each of the nine apartments and developed a value of $606,400 by the following calculation:
*83 [[Image here]]
This expert also utilized the cost approach, valuing the land at $130,800, the two newer buildings at a combined total of $571,700 and the single-family 1906 building at $133,100, for a total cost approach value of $835,600. In arriving at these figures, she allowed depreciation of 1.1% on the new structures and 16.1% on the 1906 structure. No economic or functional depreciation was allowed.
This expert stated that normally she would have given greatest weight to the income approach, but because she regarded this as an unusual case she determined that the price each unit would sell for if converted to condominium ownership was the most reflective of the market value of the property. She concluded that the property should be valued by the sales comparison approach and that the value of the property was $972,000.
The New Jersey Constitution requires that all property be assessed according to the same standard of value unless otherwise permitted by the Constitution. N.J. Const. (1947), Art. VIII, § 1, par. 1(a). The Legislature has adopted “true value” as the standard of value to be applied. N.J.S.A. 54:4-2.-25. “True value” means fair market value as of the assessment date. Town of Kearny v. Div. of Tax Appeals, 137 N.J.L. 634, 61 A.2d 208 (1948), affd 1 N.J. 409, 64 A.2d 67 (1949). The statutory scheme contemplates this value to be the value of all interests in the property. Glenwood Realty Co., Inc. v. East Orange, 78 N.J.Super. 67, 72, 187 A.2d 602 (App.Div.1963). To *84 the extent that a tenant pays less than fair market rent, it has been held that that tenant has an interest in the property which must be valued and included in the assessment. Parkwood Village Assoc, v. Bor. of Collingswood, 62 N.J. 21, 29, 297 A.2d 842 (1972). A provision for the assessment of property at a standard different from that used for properties generally in the taxing district without express constitutional authority has been held constitutionally invalid. Switz v. Kingsley, 37 N.J. 566, 182 A.2d 841 (1962); N.J. St. League of Municipalities v. Kimmelman, 105 N.J. 422, 522 A.2d 430 (1987).
The issue of whether affordable housing may be assessed at less than the standard of market value free of all encumbrances without a constitutional amendment has been decided by the Appellate Division in Prowitz v. Ridgefield Park Village, 237 NJ.Super. 435, 568 A.2d 114 (App.Div.1989) (Supreme Court petition for certification pending). In Prowitz, the Appellate Division held that reduced sale prices in favor of low- and moderate-income tenants constituted a burden on land but not an encumbrance on title, and therefore, the reduced sale price must be considered in determining the assessed value of property. Id. at 442, 568 A.2d 114.
An encumbrance on title, such as a mortgage, a lease or a cloud, is typically a matter of temporary duration, of a “curable” nature, personal to the owner, collateral to the use of the land itself and generally representative of the separate legal interests into which a single title may be divided. An encumbrance on the land, on the other hand, affects its use and disposition entirely apart from title considerations, characteristically including easements, restrictions and government regulations. [Id. at 440, 568 A.2d 114],
I am bound to follow the decision of the Appellate Division as it relates to valuation of low- and moderate-income housing for local property tax assessment purposes. Therefore, I must value the subject property at the existing rents, rather than including the interests of the tenants in the valuation, by using fair market rents for comparable non-restricted housing.
The deed restriction imposed on taxpayer by the taxing district in the subject case, limits the rental of the subject property to low- and moderate-income affordable housing rent, and thus limits the highest and best use of the property and *85 consequently diminishes the value of the property. Although to a certain extent, this is a burden imposed on the municipality to meet a State Mount Laurel requirement, Schwam v. Cedar Grove Tp., 9 N.J.Tax 406, 416 (Tax Ct.1987), aff’d 228 N.J.Super. 522, 550 A.2d 502 (App.Div.1988), certif. den. 115 N.J. 76, 77, 556 A.2d 1219 (1989), it nevertheless is a burden for a public benefit which results in a diminution of value and consequently a reduction in the ad valorem property tax, which reduction must be borne by other taxpayers in the taxing district.[1]
I am not in agreement with the value conclusion of either expert. I cannot accept taxpayer’s expert’s opinion that the highest and best use of the property is achieved by restoring it to single-family residential use. This seems to be completely unrealistic in view of the existence of nine perfectly good multi-family residential units. On the other hand, I cannot accept taxing district’s expert’s opinion that the highest and best use of this property is achieved by converting the units to condominiums and selling them for $108,000 a unit.
Taxpayer states that the rents received are half of what the property would yield if it were not restricted as affordable housing, and this statement is uncontradicted. It would appear that if the units were sold on the market subject to the restriction that so limits the rents, each unit would sell for substantially less than $108,000.
I must estimate the fair market value of the subject property using the actual rentals as limited by the planning board resolution and the deed restriction. I must also assume that the property, if offered on the market, would be purchased by the same kind of nonprofit entity that presently operates the property. The sales comparison approach is not useful in estimating the value based on these assumptions because of the scarcity of purchases of low- and moderate-income housing by *86 nonprofit entities. The cost approach also is not satisfactory because a substantial and somewhat arbitrary factor must be deducted for economic obsolescence attributable to the restricted rentals. Although not completely satisfactory, the most realistic approach for valuing this property is the income approach, using the actual income generated by the property. For this purpose, I will use not only the monthly payments by the residents but also will include the interest, at a reasonable rate, on the $15,000 refundable payment made by each resident, having been informed by counsel that the residents receive no payment for taxpayer’s use of these funds. In effect, the right to use these funds represents an additional consideration paid by the residents.
I have used the actual income and expenses but have capitalized the net income at 5.33% to reflect customary capitalization rate factors for return of the investment and tax rate but to include a minimal 2.5% as the factor for the element of return on investment because this project is a nonprofit enterprise and the hypothetical purchaser would not anticipate earning a normal profit. My calculation follows:
[[Image here]]
*87 [[Image here]]
I conclude that the value of the subject property with the burden of the affordable housing restrictions is $430,000, allocated $130,800 to land and $299,200 to improvements. The Clerk of the Tax Court is directed to enter judgment denying exemption and reducing the 1988 assessment to:
[[Image here]]

 I note that the subject case is analogous to those where the actual rents are used in the income approach when rents are limited by rent-control ordinances. See Parsippany Hills Assoc, v. Parsippany-Troy Hills Tp., 1 N.J.Tax 120, 123 (Tax Ct.1980).