MENYUK, J.T.C.
These matters come before the court on cross-motions for summary judgment. The subject property is an assisted living facility and the issue in this case is whether it is exempt from local property taxation. N.J.S.A. 54:4-3.6 exempts “all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes.” As amended by L. 1993, c. 166, § 1, the statute defines “hospital purposes” to include health care facilities for the elderly, including assisted living residences and similar facilities that provide medical, nursing or personal care services to their residents.
Presbyterian Home at Pennington (“PHP”) contends that the subject property, known as Stony Brook Assisted Living (“Stony Brook”), fits squarely within the provisions of the exemption statute. While not disputing that Stony Brook is operated as an assisted living facility, Pennington Borough (the “municipality”) contends that Stony Brook does not meet the statutory criteria for exemption because it is operated for the purpose of earning a profit for PHP’s parent, which is able to use those profits in connection with activities not covered by the claimed exemption. The municipality further asserts that even if Stony Brook did qualify for exemption under N.J.S.A 54:4-3.6, then exemption under the statute in this case would violate the Uniformity Clause of the New Jersey Constitution, N.J. Const, art. VIII, § 1, ¶ 1(a). The municipality also argues that under the Exemption Clause, N.J. Const, art. VIII, § 1, ¶ 2, the exemption in issue is not within the Legislature’s power to grant. Finally, the municipality contends that regardless of the court’s determination with respect to the other issues, PHP is not entitled to an exemption for tax year 2002, because Stony Brook was not in actual use on October 1, 2001, the valuation date for that tax year.
Both parties have moved for summary judgment with respect to tax years 2003 and 2004. Additionally, the municipality moved for summary judgment for tax year 2002. PHP also moved for summary judgment for tax year 2005.
*478 I conclude that summary judgment must be granted to the municipality denying the exemption for tax year 2002, because the facility was not yet operational, and for tax years 2003 and 2004 because the facility was not operated for hospital purposes within the meaning of N.J.S.A. 54:4-3.6. As for tax year 2005, PHP’s motion for summary judgment is denied. Because I have determined that the facility was not entitled to exemption under the statute, I need not reach the constitutional issues. See, e.g., O’Keefe v. Passaic Valley Water Comm’n, 132 N.J. 234, 240, 624 A.2d 578 (1993) (“[C]ourts should not reach constitutional questions unless necessary to the disposition of the litigation.”) (citations omitted). The municipality did not make a motion with respect to tax year 2005 and, accordingly, the matter will proceed to trial on the issue of exemption for that tax year, and on issues of valuation for all of the tax years before me.

Procedural History

The subject property is identified on the municipal tax map as Block 1.01, Lot 3, also known as 143 West Franklin Avenue. The assessment for tax year 2002 was:
Land: $1,042,200
Building: 8,286,200
Total: $9,328,400
PHP filed a direct appeal of the 2002 assessment with this court. For the remaining tax years in issue, the subject property was listed as exempt, and the exemptions were appealed by the municipality to the Mercer County Board of Taxation, which dismissed the petitions without prejudice because of the pending Tax Court actions for the prior years. Appeals of the county board’s judgments were filed with this court and joined with the 2002 appeal.
Rule 4:46 provides that summary judgment should be granted when “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a *479 matter of law.” R. 4:46-2(c). The court must consider “whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.” Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
I have considered the extensive certifications with exhibits submitted by both parties, the deposition testimony of several officials of Presbyterian Homes and Services, Inc. (“PHS”), an affiliate of PHP, and the deposition testimony of the municipality’s consultant. I find that there are no material issues of fact in dispute that would preclude an order of summary judgment.

Acquisition of the Subject Property

The subject property has 7.39 acres of land and is improved with a three story building licensed by the State of New Jersey as an assisted living residence. PHP acquired Stony Brook on October 1, 2001 for a purchase price of $13,300,000. The purchase was initially financed by a bank loan. In December 2002, the proceeds of bonds issued by the New Jersey Economic Development Authority were used to re-finance the acquisition.
The subject property had originally been developed by another company as a for-profit assisted living residence but the facility had not been opened at the time of its acquisition by PHP. Pursuant to N.J.S.A. 26:2H-1 to -5, PHP obtained a license effective February 1, 2002 to operate Stony Brook as an assisted living residence. PHP opened Stony Brook in February 2002. At all times in issue here, the subject property was the only property owned by PHP; the only business conducted by PHP was the ownership and operation of Stony Brook as an assisted living facility for elderly residents.
As stated above, PHP is affiliated with PHS. As described in the December 15, 2002 official statement issued in connection with the bonds used to re-finance the acquisition of the subject property:
PHS was founded in 1916 and it is New Jersey’s largest provider of retirement housing and senior living health care. PHS is the parent organization of a number *480 of New Jersey not-for-profit corporations which own and operate three retirement communities, two assisted living facilities and other facilities serving senior citizens in New Jersey. PHS’ affiliated entities operate an aggregate of 937 independent living units, 192 assisted living units, 52 comprehensive personal care boarding home beds, 184 nursing beds and 1,410 units of affordable senior housing. Over 3,000 people reside in the 19 affiliated communities that are part of the PHS system throughout New Jersey. PHS facilities cover a broad range: continuing care retirement communities; assisted living facilities; skilled nursing facilities; residential healthcare and affordable housing developments. Over 1,300 employees work for these entities to meet the needs of its residents.
PHS’ affiliated entities are set up as separate not-for-profit corporations that are financially self-sustaining. This means that funds paid by residents are used in each community to provide programs and services.

Operation of the Subject Property

Stony Brook has ninety-six assisted living units, including nineteen units designed for persons with Alzheimer’s disease or other types of memory impairment. The units range in size from 300 to 790 square feet. The common areas in the facility include a dining room, a private dining area, a living room area, a café open twenty-four hours a day, a library with computers, a conference room, a billiard room, a beauty parlor, an activities center, a multimedia room, card rooms, and a secured courtyard for outside activities.
The facility offers services and amenities which, in the words of a Stony Brook brochure, include among other things, “three delicious meals daily”; “weekly housekeeping and fresh linen service”; “life-enriching cultural, spiritual, educational and social activities and events”; “scheduled transportation to medical appointments, banking, shopping, and day trips”; “library with current best-sellers and beloved classics”; beauty/barber shop; emergency call system; basic cable television; and twenty-four hour staffing by licensed health care professionals. That health care professional staffing is in three eight-hour shifts, each consisting of a single licensed nurse professional on site.
Each resident is regularly assessed by healthcare professionals to determine his or her needs. Individualized care plans are tailored to assure that residents receive just the amount of care necessary, from a reminder to take a medication, to help with dressing or other daily activities, to assistance with more intensive *481 health care needs. According to the agreement entered into by PHP with the residents, when a resident requires more than assistance with daily activities, PHP may require a resident to relinquish his or her living unit. Among other conditions that may trigger the termination of the residence agreement between PHP and the resident are a medically unstable condition or a special health problem for which an appropriate therapy cannot be implemented at Stony Brook, a need for 24-hour, seven day a week nursing supervision, if a patient is bedridden for more than fourteen consecutive days, or if the resident is consistently totally dependent in four or more areas of daily living, including eating, bathing, dressing, grooming and toileting. In other words, Stony Brook is not a facility for the seriously or acutely ill, but for elderly residents who because of age or chronic illness are frail and who may require some degree of assistance with normal, everyday activities.
Stony Brook’s basic lees for a unit during 2003 and 2004 were as follows:
Description of Unit Daily Rate 2003 Average Monthly Rate 201)3 Daily Rate 2004 Average Monthly Rate 2004
Shared Suite [1] $ 83 $2532 $ 87 $2653
Standard Private Suite_$116 $3538 $120 $3660
One Bedroom Suite_$137 $4178 $143 $4361
One Bedroom Suite with Den $141 $4301 $147 $4483
Two Bedroom Suite $150 $4575 $156 $4758
Taylor Commons (Alzheimer’s Unit) $165 $5032 $172 $5246
Second person sharing a suite[1] $ 825 $ 854
*482 The foregoing schedule indicates that yearly basic fees ranged from approximately $30,400 to $60,400 during 2003 and from $31,900 to $63,000 in 2004. Stony Brook also charged additional fees, ranging from $16 a day to $43 a day for persons requiring varying degrees of additional assistance beyond that covered by the basic fee. There was no description of what services were provided for those additional charges. There were also additional daily fees for other services such as “basic medication management” ($5); diabetic care ($2); and other injections ($15 per injection). Assistance with incontinence products was also subject to an additional daily charge of $5 or $10 per day, depending upon how often such assistance was required.
Stony Brook’s marketing plans for 2003 and 2004 identified other assisted living residences in the geographic area surrounding Pennington. Almost all were operated as for-profit facilities. By and large, the rates listed for those competitors were comparable to the rates charged by Stony Brook, with some being slightly higher and others being slightly lower. According to Eric Gurley, PHS’ Senior Vice President and Chief Financial Officer, Stony Brook has higher staffing levels than the typical for-profit assisted living facility in New Jersey. As an example, he stated that New Jersey regulations require that a licensed nurse professional be on site for one eight hour shift a day and that Stony Brook provides three eight hour shifts consisting of one nurse for each shift. He did not identify any for-profit facility that staffs at minimum levels.
Although there is no age requirement for residence at Stony Brook, as a practical matter only older persons have sought admission there.[2] To date, every resident of Stony Brook has *483 been over the age of 65 at the time of admission. Each person desiring to reside at Stony Brook is required to complete an assisted living reservation agreement and a confidential resident application and to pay a community fee of $2500. If the individual is rejected by Stony Brook, or if the individual determines not to reside at Stony Brook, or if the individual moves in but leaves before the expiration of thirty days, $2250 is refunded. The remaining $250 is designated as an application processing fee and is nonrefundable. According to Stony Brook’s marketing plans, Stony Brook’s for-profit competitors had similar entrance fees.
The confidential resident application asks for a variety of health and financial information. As explained in the deposition testimony of Lori High, a vice president of PHS in charge of sales and marketing, Stony Brook looks for people who can afford to live at the facility, or people who have families who agree to be wholly or partly responsible for the resident’s fees. Stony Brook has one rule of thumb for financial eligibility for admission: the resident needs to be able to afford to live there and be able to pay privately for at least two years. The two year period is derived from PHP’s expectation that on average, a resident will remain for two years before the resident dies or requires a skilled nursing facility.
Upon being accepted at Stony Brook, a resident is required to enter into a residency agreement with PHP. Under the terms of that agreement, if a resident fails to pay the charges on Stony Brook’s monthly statement within thirty days of the due date or any extended due date granted by PHP, PHP may terminate the agreement and the resident may be required to vacate the unit upon thirty days written notice. PHP will assist any resident with any application for Medicaid benefits, but the resident is personally responsible for all charges incurred under the agreement if the resident is determined to be ineligible. A resident is also person *484 ally responsible for all charges until Medicaid benefits are actually granted.
PHP does not maintain an endowment or other fund which would provide charitable assistance to a resident who runs out of money to pay Stony Brook’s fees. PHP points out that in the ninety year history of PHS, no PHS affiliate has ever evicted a resident who, through no fault of his or her own, has become unable to afford the charges for his or her care. While it is the hope of PHP that it will never terminate a resident who, through no fault of his or her own, is no longer able to pay Stony Brook’s fees, it does not guarantee that it or its affiliates will subsidize such a resident.
As required by N.J.S.A. 26:2H-12.16(b), ten percent (10%) of Stony Brook’s units are reserved for use by Medicaid-eligible individuals. According to Ms. High’s deposition testimony, no marketing effort is made to identify Medicaid-eligible potential residents.
PHP is reimbursed by the government for each Medicaid resident at a rate of $60 a day or about $1800 a month or $21,000 a year, substantially less than the private pay rates charged by Stony Brook, as set forth at page 481 supra. PHP is required to accept that amount in full payment for a resident whose fees are being reimbursed by the State of New Jersey. The Medicaid program apparently has no regular or dedicated funding for payment of assisted living fees. Rather, eligible persons must apply for payment of assisted living fees from Medicaid through what the parties described as a “waiver” program. The parties disputed the availability of Medicaid “slots” made available through the waiver program.
During the tax years in issue, Stony Brook had one long-term Medicaid resident in 2003, three in 2004, and four in 2005. It is not know whether or not these residents had been admitted on a full pay basis and later applied for Medicaid assistance, or whether they were admitted under a Medicaid waiver. In addition to the long term residents whose fees were being paid by Medicaid, Stony Brook had three short term respite residents in 2003 and *485 one in 2004 whose fees were also paid by Medicaid. The lengths of their stays are unknown.
Stony Brook’s Medicaid policy, issued in response to a directive from the New Jersey Department of Health and Senior Services requiring assisted living facilities to produce a disclosure handbook, states that it participates in the New Jersey Medicaid Program and has, depending on availability, shared suite living accommodations for its Medicaid-funded residents. It further states:
Upon receiving a new or existing resident’s application to enter or remain in the facility funded by the Medicaid program, Stony Brook will evaluate its then current level of Medicaid Program participation, the waiting list of individuals seeking-admission, and other relevant factors to determine if the resident will be admitted or remain in residence at Stony Brook under the Medicaid Program. If Stony Brook determines that the resident is not eligible to remain in the facility under the Medicaid Program at its sole discretion, the resident agrees to vacate the premises in accordance with the terms and conditions of the Residence & Care Agreement and Stony Brook policies.

Facilities Management Agreement

PHP entered into a facilities management agreement with PHS on October 1, 2001, at about the time that PHP acquired Stony Brook. Under the agreement, PHS, as manager, has the complete authority to review, supervise, manage, and control all phases of the operation of the facility. The agreement is for an initial term of ten years with five successive renewal options of five years each. If PHS is in compliance with the agreement, renewal is automatic. The agreement can be terminated only by written mutual consent of both parties or in the event of the closing of the facility.
Under the agreement, PHS is entitled to receive a fee in the amount of five percent of PHP’s revenues for each year. “Revenues” is defined as the gross revenues from services to patients, less bad debt allowances and adjustments and contractual allowances with third party payors. PHS is not entitled to any fee until all other expenses for a period have been paid or reserved for, and if there are insufficient revenues after payment of all current expenses to pay PHS its fee, the shortfall is accrued and is to be paid as soon as sufficient funds become available.
*486 Apart from the five percent management fee charged by PHS to PHP, PHS separately charges PHP for: (a) information technology (“IT”) services; (b) centralized accounting services; and (c) legal services. The persons responsible for performing IT services, accounting services and legal services are employed by PHS at its offices located in West Windsor, New Jersey. PHS allocates these costs to PHP on the basis of PHS’ actual or estimated cost of the provision of these services. According to the certification of Garrett Midgett, Vice President for Finance for PHS, PHS allocates the cost of providing IT services among its various affiliated facilities on the basis of the percentage of computers used by the staff at each affiliated corporation compared to the total number of computers used throughout the affiliated corporations. In 2003, for example, the PHS IT department was responsible for the operation of a total of 304 computers located at PHS, the continuing care retirement communities (“CCRCs”), the assisted living residences, the affordable housing facilities and other affiliated corporations. PHP had twelve computers, or 3.95% of the total number of computers, and was therefore charged 3.95% of the cost of the PHS IT department.
Mr. Midgett further explained that charges for centralized accounting services are allocated in two ways. For individual transactions, such as paying accounts payable, group purchasing, payroll and billings/collections, each CCRC, assisted living residence, and affordable housing facility is charged based on its allocable percentage of transactions completed. According to Mr. Midgett, the affordable housing facilities are not charged by PHS for billing and collections because those activities are done at each affordable housing facility.
PHS allocates costs for more generalized accounting, budgeting, Medicare/Medicaid cost reporting, tax return preparation, and audit services among all the affiliated corporations on the basis of cost estimates done on a periodic basis by PHS. The PHS finance department has its staff members estimate what percentage of their time is actually spent performing work for the affiliated entities. Charges for legal services provided by the PHS Vice President and General Counsel, Maureen Cafferty, are allocated *487 to PHP in the same percentage as centralized accounting. According to Ms. Cafferty, she does not keep time sheets or formally record time spent on PHP matters, but states that the legal costs allocated to PHP had never been disproportionate to the amount of time she spent doing woi'k for PHP. When outside law films do work for an affiliated corporation, such as PHP, the fees and costs attributable to that work are billed by the firms to and paid for by the particular affiliated corporation.
The senior manager of Stony Brook, the Executive Director, is an employee of PHS and is compensated by PHS, but her compensation is charged back at cost to PHP. The other persons employed at Stony Brook are employed directly by PHP. Those employees number between forty and fifty full and part-time employees,[3] including registered nurses, licensed practical nurses, nurses’ aides, activities staff, dietician and dining services staff, marketing representatives, maintenance and custodial staff and administration. The wages and benefits of PHP’s employees are set at market levels.

Corporate Organization

PHP was organized in August 2000 as a New Jersey nonprofit corporation pursuant to N.J.S.A. 15A:1-1 to 15A:16-2. It is qualified as a tax exempt organization under Section 501(c)(3) of the Internal Revenue Code (“I.R.C.”), as one of the members of a group included in a ruling issued by the Internal Revenue Service to PHS, also a New Jersey nonprofit corporation.
PHP and PHS have the identical board of trustees. The members of the board of PHP are appointed annually by the *488 board of PHS. According to Mr. Gurley, the board of PHS is common to all of its affiliates except those facilities denominated as affordable housing. The PHP bylaws provide that the officers of PHP shall be the same people serving in those positions for PHS, and that any changes to the PHP bylaws must be approved in writing by the PHS Board of Trustees.
The officers of PHS are paid by PHS and do not receive any additional compensation from PHP for services rendered by them to PHP. According to PHS, the salaries of its officers are developed by way of salary surveys. The seven surveys used were identified in a document entitled “2002-2003 Management Compensation Program Report and Recommendations.” The seven surveys identified were not described in any detail, but they did not appear to be limited to nonprofit companies, although almost all appeared to be related to the health care industry. For example, one was a 2001-2002 Nursing Home Salary and Benefits Report, conducted in conjunction with the American Association of Homes and Services for the Aging. According to Mr. Gurley, the salaries and benefits of all management employees of PHS, including the Executive Director of Stony Brook, are set at the middle of the salary range determined by the wage suivey.
Management employees of PHS (including the Executive Director of Stony Brook) are paid a base compensation and are also eligible for annual incentive payments, which are made based on several weighted components, only some of which are related to financial performance. According to Mr. Gurley, the amount of any such incentive bonus is limited so that, even adding the maximum bonus to the base salary, a management employee’s compensation and benefits will not put him or her above approximately the seventy-fifth percentile in the most recent wage suivey for the particular position.

Tax Year 2002

Without regard to the court’s resolution of any of the other issues raised by this motion, the municipality contends that the subject property is not entitled to exemption for tax year 2002, *489 because it was not used for the claimed exempt purpose on October 1, 2001, the valuation date for tax year 2002. PHP counters that the municipality is estopped from denying it exemption for that tax year because municipal officials represented to PHP that it would receive an exemption for 2002 if it closed on the property by October 1 of the pretax year. According to PHP’s brief, “[i]n reliance upon Pennington’s representation, PHP accelerated the purchase, assuming a significant debt burden without offsetting revenues and making other compromises it otherwise would not have made.” PHP also argues that this is one of “the rare cases” in which exemption should be granted notwithstanding that Stony Brook was not operational until after October 1 of the pretax year.
It is undisputed that PHP acquired the subject property on October 1, 2001 and that Stony Brook did not open its doors to residents until sometime in February 2002. According to PHP, there was at least one meeting between representatives of the municipality and representatives of PHS shortly before PHP closed title to the subject property. Karen Waldron, the Pennington Borough administrator, Edwin Schmierer, the attorney for the Pennington Planning Board, Maureen Cafferty, General Counsel of PHS, Eric Gurley, the treasurer of PHS (and of PHP), and Edward Truscelli, the PHS Vice President of Planning and Development, were present at the meeting. Several issues were discussed during that meeting, including work that would have to be completed before a certificate of occupancy for the subject property could be obtained, and the completion of various conditions imposed as part of the Pennington Planning Board approval of the project. The subject of tax exemption was also discussed. Although none of the PHS representatives recall precisely what words were used by the municipal representatives, PHS general counsel Maureen Cafferty testified at her deposition that municipal officials had promised that “we would have our tax exempt status provided we purchased the building by October 1.”
The attorney for the Pennington Planning Board recalls the meeting somewhat differently in his certification. He states that there were no affirmative representations made by him or the *490 Borough administrator. According to Mr. Schmierer, the parties did discuss a possible agreement for payments in lieu of taxes (“PILOT”) to compensate the Borough for providing various municipal services in the event that PHP was granted a tax exemption. Mr. Schmeirer also certified that both he and Ms. Waldron fully understood that neither of them had the authority to grant an exemption, which could only be granted by the assessor.
Notwithstanding the differing recollections as to what occurred at the meetings between representatives of the parties prior to October 1, 2001, I find that there are no issues of material fact which would preclude resolution of the appeal for tax year 2002 by way of summary judgment motion. What was said at the meeting that took place prior to PHP’s acquisition of the subject property is clearly an issue of fact. There is also some doubt as to whether or not PHP relied on a promise by the municipality in completing its acquisition of the property on October 1, 2001. As pointed out by the municipality, PHP entered into the agreement for the purchase of the subject property in May 2001, and the agreement contemplated a closing no later than Monday, October 15, 2001, “time being of the essence.” In other words, a closing at about the time the property was actually acquired by PHP had been contemplated from at least May 2001 and prior to the meeting with the municipal officials. Further, according to the deposition testimony of Mr. Truseelli, PHS (or PHP) had subcontractors come in and perform a substantial amount of work on the facility before title formally closed. I conclude that whether a promise of exemption was made and whether PHP substantially and detrimentally relied on such a promise are not material facts, and that the municipality is entitled to summary judgment as a matter of law with respect to the assessment for tax year 2002.
The law is well settled that entitlement to exemption is determined as of October 1 of the pretax year. See Catholic Relief Servs., U.S.C.C. v. South Brunswick Tp., 9 N.J.Tax 25, 27-28 (1987) (“exempt status is contingent on the confluence of use and ownership on the assessment date”); Atl. County New Sch., Inc. v. City of Pleasantville, 2 N.J.Tax 192, 196 (1981) (citing numerous cases supporting the principle that questions of exemption or *491 valuation are determined as of the assessing date, October 1 of the pretax year, unless the Legislature has specifically provided otherwise).
[I]f there is no qualification for exemption under N.J.S.A. 54:4-3.6 in the first place by ownership and use on October 1, the property is not entitled to exempt status for the tax year in question. Equality of the public tax burden is a fundamental tenet of our statutes. Since a statutory exemption departs from this, it is strictly construed against the exemption claimant.
[Id. at 197 (citations omitted).]
See also Job Haines Home for the Aged v. Bloomfield Tp., 19 N.J.Tax 408, 417 (2001), aff'd, 20 N.J.Tax 137 (App.Div.2002) (“In order to obtain a property tax exemption under N.J.S.A. 54:4-3.6, the taxpayer must show actual use as of October 1 [of the pretax year] for a specified exempt purpose.”).
As plaintiff concedes, estoppel is rarely invoked against a public entity. See, for example, Black Whale, Inc. v. Director, Div. of Taxation, 15 N.J.Tax 338, 355 (1995) (collecting cases), in which the court particularly noted that “[e]stoppel has not barred the imposition of a tax which a governmental representative has verbally indicated by words or writing is not applicable, or would be imposed differently than eventually assessed.” Moreover, neither the planning board nor the municipal administrator has the statutory authority to make a determination as to the eligibility of property for exemption under N.J.S.A. 54:4-3.6. The design of the local property tax statutes enacted by the Legislature makes clear that it is the municipal assessor who determines a claim for exemption of property.[4] N.J.S.A. 54:4-4.4.
*492 In support of its position that this is one of the rare eases in which estoppel should be applied against a municipality, PHP cites New Concepts for Living, Inc. v. Hackensack, 22 N.J.Tax 616, 622 (App.Div.2005), in which the Appellate Division cautioned in dicta against taking “an unduly restrictive view of plaintiffs ability to make out a claim of estoppel.” More to the point, the Appellate Division in New Concepts did not consider whether a municipality was estopped from denying the entity’s statutory eligibility for an exemption. The issue in that case was whether the plaintiffs complaint claiming exemption should be dismissed for untimely filing where there had been ongoing negotiations between the parties and where there had been no explicit mention of the statute of limitations for filing a complaint contesting an assessment. The Appellate Division held that plaintiff was entitled to be heard on the issue of exemption on the basis that the municipality had failed to turn “square corners” with the plaintiff.[5] Id. at 626. The court found that the municipality “had lulled the plaintiff into a false sense of security” and then “inequitably and suddenly reversed its position, [and] availed itself of a technicality.” Id. at 625. In other words, the Appellate Division did not decide whether the plaintiff was entitled to an exemption but remanded the case so that plaintiff would have the opportunity to establish its entitlement to the exemption, after the municipality had permitted the statute of limitations for filing an appeal to run while purporting to negotiate with the taxpayer. PHP has clearly had the opportunity to be heard on the issue of exemption in this case, *493 and the municipality has never contended that it should not have that opportunity.
PHP further asserts that the municipality was aware of the intended nonprofit nature of the subject property well before October 1, 2001, that PHP had planned on the tax exemption, and that PHP had already begun negotiating a PILOT agreement. PHP contends that the courts of this state have found exceptions from the requirement that a facility be in full operational use as of October 1 of the pretax year, and that under the circumstances of this case, such an exception should be made here. It relies on Paper Mill Playhouse v. Millburn Township, 7 N.J.Tax 78 (1984), and Job Haines Home, supra. As noted by the Tax Court in the latter case, however, “[m]ere intended or projected use is not enough to qualify for an exemption.” Job Haines Home, supra, 19 N.J.Tax at 417. The court explained that the exception carved out in Paper Mill Playhouse was for property that had been “previously exempt, but, for one reason or another, discontinue[d] actual use of the property during a discrete reconstruction period.” Ibid. In Paper Mill Playhouse, the building had been destroyed by fire and was under reconstruction during the tax year- in issue, and the court determined that a continued exempt character exception to the actual use standard should be applied. 7 N.J.Tax at 86. In Job Haines Home, the exempt nursing home facility was in the process of being expanded. The comb determined that the addition to the property also fell within the “continued exempt character” exception to the requirement of actual use. 19 N.J. Tax at 419-20.
In this case, the subject property had not previously been classified as exempt. It had been developed as an assisted living facility to be operated by a for profit entity prior to its acquisition by PHP. Stony Brook plainly does not fall within a “continued exempt character” exception to the requirement that a property must actually be used for the exempt purpose as of October 1, 2001. I therefore conclude that the municipality’s motion for summary judgment with respect to tax year 2002 must be granted.

*494
Tax Years 2003, 200b and, 2005

Certain well-established principles are applicable to exemption determinations. Because they represent a departure from the fundamental approach of our statutes that all property bear its just and equal share of the public burden of taxation, exemption statutes are strongly construed against those claiming exemption. Princeton Univ. Press v. Princeton Bor., 35 N.J. 209, 214, 172 A.2d 420 (1961). Those claiming an exemption from taxation have the burden of establishing their entitlement to it. Ibid. Strict construction does not require a rigid interpretation that would defeat the evident legislative design, but taxation is the rule, and the claimant bears the burden of proving entitlement to an exemption. New Jersey Carpenters Apprentice Training Educ. Fund v. Kenilworth Bor., 147 N.J. 171, 177-78, 685 A.2d 1309 (1996), cert. denied, 520 U.S. 1241, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997). As always, the judicial function is to determine the legislative intent as expressed in the statute. Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 507, 472 A.2d 517 (1984).
N.J.S.A. 54:4-3.6 sets forth three criteria for exemption of property from local property taxation: (1) the entity owning the property must be organized exclusively for the exempt purpose; (2) the property must actually be used for the exempt purpose; (3) the operation and use of the property must not be for profit. See Paper Mill Playhouse, supra, 95 N.J. at 506, 472 A.2d 517; Hunterdon Med. Ctr. v. Readington Tp., 22 N.J.Tax 302, 315 (2005), aff'd, 391 N.J.Super. 434, 918 A.2d 675 (App.Div.2007).
PHP claims exemption based on its contention that Stony Brook is used for hospital purposes. The statutory language in issue is as follows:
As used in this section “hospital purposes” includes health care facilities for the elderly, such as nursing homes; residential health care facilities; assisted living residences; facilities with a Class C license pursuant to P.L. 1979, c. 496 (C. 55:13B-1 et al.), the “Rooming and Boarding House Act of 1979”; similar facilities that provide medical, nursing or personal care services to their residents; and that portion of the central administrative or service facility of a continuing care retirement community that is reasonably allocable as a health care facility for the elderly.
[N.J.S.A. 54:4-3.6 (emphasis added).]
*495 Initially, it should be noted that the term “assisted living residence” is not defined by N.J.S.A. 54:4-3.6. The term was not defined or used in any other statute until enactment of L. 2002, c. 25, relating to the issuance of a certificate of need for an assisted living facility, nine years after enactment of L. 1993, c. 166. That statutory definition is codified at N.J.S.A. 26:2H-7.15. The term “assisted living residence” seems to have made its first appearance in the State Health Plan (“Plan”), proposed in early 1992. 24 N.J.R 1164, 1190 (Apr. 6,1992).
The part of the Plan concerned with long term care services was embodied in a further proposal by the Department of Health in June 1992 and adopted effective September 8, 1992. See 24 N.J.R. 2014 (June 1, 1992); 24 N.J.R. 3144 (Sept. 8, 1992). As adopted, the regulation defined “assisted living residence” as:
[A]n establishment that offers apartment-style housing, congregate dining, assistance with activities of daily living, and nursing care and supervision as needed to four or more adult persons unrelated to the proprietor. Apartment units offer at least one unfurnished room per resident, a private bath, and a lockable door on the unit entrance.
[24 N.J.R. at 3151.]
That regulation is now codified at N.J.A.C. 8:33-1.3, in substantially the same form. Shortly after the proposal of the Plan, the Department of Health also promulgated regulations providing standards for licensure of assisted living residences and comprehensive personal care homes. See 25 N.J.R. 3734 (Aug. 16, 1993); 25 N.J.R. 6037 (Dec. 20, 1993). The definition of “assisted living residence” as initially adopted and now codified at N.J.A.C. 8:36-1.3, was substantially identical to the earlier regulation. See 25 N.J.R. at 6044.
Although there is no evidence that the Legislature looked to the State Health Plan in enacting L. 1993, c. 166, the timing of the Plan and the promulgation of regulations relating to it, including the definition of assisted living residence, occurred in 1992, shortly before the enactment of L. 1993, c. 166. Neither party has suggested that as used in N.J.S.A. 54:4-3.6, the term should be interpreted differently.
*496 Thus, although both parties do not dispute that Stony Brook is an assisted living residence, it is not entirely clear what the Legislature intended by placing these health care facilities within the existing “hospital purposes” exemption. The goal of statutory construction is to “effectuat[e] the legislative plan as it may be gathered from the enactment read in full light of its history, purpose and context.” Koch v. Director, Div. of Taxation, 157 N.J. 1, 7, 722 A.2d 918 (1999) (citations omitted). The legislative history of L. 1993, c. 166 gives some indication of the legislative intent. Assembly Bill No. 2048, eventually enacted as L. 1993, c. 166, contained the following introductory statement:
This bill provides property tax exempt status for non-profit health care properties for the elderly.
According to the sponsor most non-profit health care facilities for the elderly are exempt from property tax under one of the provisions of the exemption law on nonprofit organizations. However, there is no explicit exemption for non-profit health care facilities for the elderly. To protect their status, and to clarify the basis for their exemption, this bill amends the current exemption law on nonprofit organizations so that the term “hospital purposes” includes health care facilities for the elderly, such as nursing homes; residential health care facilities; assisted living facilities; facilities with a Glass C license pursuant to P.L. 1979, c. 496 (C.55:13B-1 et seq.), the “Rooming and Boarding House Act of 1979”: similar facilities that provide medical, nursing or personal care services to their residents; and that portion of the central administrative or sendee facility of a continuing care retirement community that is reasonably allocable as a health care facility for the elderly.
[Statement, A.2048 (Nov. 23,1992).]
Governor Florio’s office issued a news release upon the bill’s enactment that expressed similar concerns:
The new law closes a loophole in the state’s property tax code which granted property exempt status to non-profit health care facilities organized for religious, charitable or hospital purposes. While some towns may have exempted health care facilities for the elderly under one of the existing exemptions, no explicit exclusion for such facilities existed.
In New Jersey, about one-quarter of the elderly health care facilities are nonprofit. The new law ensures that non-profit hospitals, religious homes and residential health care facilities will all be treated the same way with the same rules. It also means that non-profits can hold their costs down because they’ll be better able to predict their costs and plan for the long term. Keeping health care costs down for seniors will help put the brakes on insurance premiums for everyone, the Governor noted.
[News Release, “Governor Signs Law Closing Property Tax Loophole,” Office of the Governor (July 1,1993).]
*497 Shortly before the enactment of L. 1993, c. 166, two judicial decisions had denied exemption to nursing home and long-term care facilities which had claimed exemption based on their use for hospital purposes. See Woodstown Bor. v. Friends Home at Woodstown, 12 N.J.Tax 197, 204-05 (1992) (holding that a long-term care facility, part of which was a skilled nursing facility and the remainder of which was used for residents who needed less intensive care, was not used for hospital purposes because it was not a hospital, but a residence); Intercare Health Sys., Inc. v. Cedar Grove Tp., 11 N.J.Tax 423, 431 (1990); aff'd, 12 N.J.Tax 273 (App.Div.1991), certif. denied, 127 N.J. 558, 606 A.2d 369 (1992) (denying exemption for hospital purposes for a skilled nursing facility and a long-term care facility that was affiliated with a hospital, on the basis that a hospital purpose is an activity that is integrated into an organized hospital operation, and that the building in issue had to be an integral part of a functioning hospital in order to qualify as exempt). Although there is nothing explicit in the legislative history regarding those decisions, the timing indicates that those decisions may have been a factor in enacting L. 1993, c. 166. “In construing a statute it is to be assumed that the Legislature is thoroughly conversant with its own legislation and the judicial construction” placed on it. Barringer v. Miele, 6 N.J. 139, 144, 77 A.2d 895 (1951); see also Brewer v. Porch, 53 N.J. 167, 174, 249 A.2d 388 (1969) (same).
From the foregoing, 1 conclude that in enacting L. 1993, c. 166, the Legislature intended to exempt health care facilities intended primarily for the elderly, such as nursing homes and assisted living facilities, even if they were not part of a hospital or integrated with a hospital, to the same extent that similar facilities operated by religious or charitable organizations were eligible for exemption.
To effectuate this intent, the Legislature chose to place the exemption for such health care facilities in the “hospital purposes” exemption of N.J.S.A. 54:4-3.6. The court must assume that this legislative choice had some meaning. “It is a cardinal rule of statutory construction that full effect should be given, if possible, to every word of a statute. We cannot assume that the Legisla *498 ture used meaningless language.” McCann v. Clerk of Jersey City, 167 N.J. 311, 321, 771 A.2d 1123 (2001), quoting Gabin v. Skyline Cabana Club, 54 N.J. 550, 555, 258 A.2d 6 (1969); see also Paper Mill Playhouse, supra, 95 N.J. at 521, 472 A.2d 517 (rejecting an interpretation of N.J.S.A. 54:4-3.6 because it rendered a part of the statute meaningless).
There is no evidence that in enacting the 1993 amendment, the Legislature intended to make irrelevant those characteristics of a hospital that make a hospital eligible for an exemption. “The underlying rationale for the exemptions is as a quid pro quo for the performance of a service essentially public, and which the state thereby is relieved pro tanto from the necessity of performing.” Jersey Shore Med. Ctr. v. Neptune Tp., 14 N.J.Tax 49, 56 (1994) (citation omitted). See also Job Haines Home, supra, involving a health care facility for the elderly for which exemption was claimed based on the same language of N.J.S.A. 54:4-3.6 relied upon by PHP here, where the court noted that, “[generally, exemptions are granted in recognition of the benefit conferred upon the public in fulfillment of the exempt organization’s objectives. In order to justify an exemption, there must be a quid pro quo for the performance of a service that is essentially public.” (citations omitted). 19 N.J.Tax at 417.
The quid pro quo provided by hospitals has traditionally been the availability of treatment to anyone who seeks it, at least on an emergency basis, regardless of ability to pay. See N.J.S.A. 26:2H-18.64 (“No hospital shall deny any admission or appropriate service to a patient on the basis of that patient’s ability to pay or source of payment.”).
In Southern Jersey Family Medical Centers, Inc. v. City of Pleasantville, from other vendors or by use 351 N.J.Super. 262, 265-69, 798 A.2d 120 (App.Div.2002), affd per cmiam 176 N.J. 184, 821 A.2d 1147 (2003), the Appellate Division concluded that an organization that provided health and dental care to anyone who presented himself or herself for treatment irrespective of a patient’s ability to pay, and whose primary patient population was medically underserved or indigent was entitled to exemption as *499 actually used for charitable purposes, notwithstanding that it received substantial government funding, including Medicaid and Medicare payments, and virtually no voluntary charitable contributions. The court found compelling this state’s policy of providing access to health care to all of its citizens:
The State of New Jersey has identified ensuring access to medical care to its citizens as a public purpose. According to the Health Care Cost Reduction Act, “[i]t is of paramount public interest for the State to take all necessary and appropriate actions to ensure access to and the provision of high quality and cost-effective hospital care to its citizens.” “Access to quality health care shall not be denied to residents of this State because of their inability to pay for care.”
[Id. at 276, 798 A.2d 120 (citations omitted).]
As discussed above, the legislative history of L. 1993, c. 166 indicates that the legislative intent was to exempt health care facilities intended primarily for the elderly, even if they were not part of a hospital or integrated with a hospital, to the same extent facilities operated by religious or charitable organizations were eligible for exemptions. The latter organizations typically provide services to the poor. See, e.g., Catholic Charities of the Diocese of Camden v. City of Pleasantville, 109 N.J.Super. 475, 480, 263 A.2d 803 (App.Div.), certif. denied, 56 N.J. 474, 267 A.2d 56 (1970) (exemption for religious and charitable use affirmed for facility that sought to admit economically disadvantaged and those receiving public assistance or welfare).
I conclude that in amending N.J.S.A. 54:4-3.6 to include health care facilities for the elderly within the exemption for hospital purposes, the Legislature did not intend to relieve these facilities from the obligation imposed on hospitals to provide some measure of charitable care.

Organization Exclusively for Hospital Purposes

PHP’s certificate of incorporation and its bylaws state that it “is organized exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code.” PHP’s bylaws go on to state that these purposes shall include, without limitation:
(a) To provide elderly, disabled and other needy persons with housing facilities, medical, nursing and physical care, understanding, companionship and other *500 services to help them lead satisfying lives, including, without limitation, the establishment of homes, communities, facilities and services to carry out this purpose;
(b) To develop and maintain other housing facilities and health and welfare services, programs or facilities for persons of any age to help meet social needs;
(c) To cooperate with health care providers through joint ventures or other arrangements to better serve the health care needs of the communities the Corporation serves;
(d) To render to any persons, whether residing in facilities maintained by the Corporation or any organization affiliated with the Corporation, or residing elsewhere, community outreach services and charitable assistance when circumstances warrant such sendees and assistance and when funds for such charitable assistance are available;
(e) To provide meals, nutritional, medical and housekeeping services, assistance in daily living and other charitable assistance to needy individuals;
(f) To furnish services, facilities, and charitable assistance without regal'd to a person’s sex, race, creed, color or national origin; and
(g) To make distributions to charitable organizations described in section 501(c)(3) of the [Internal Revenue] Code in furtherance of the Corporation’s purposes.
PHP claims exemption only on the basis that its property is “used in the work of associations and corporations organized exclusively for hospital purposes.” N.J.S.A. 54:4-3.6. It contends that its organizational documents are sufficiently descriptive to satisfy the “organized exclusively for hospital purposes” requirement. PHP asserts that the numerous purposes set forth in its bylaws are descriptive of an assisted living facility, and that the “exclusively organized” requirement is met if one or more of the activities entitled to exemption under N.J.S.A. 54:4-3.6 are set forth in its organizational documents. It relies primarily upon Job Haines Home, supra, 19 N.J.Tax at 415, where the organizational documents did not use any of the statutory terms such as “hospital purposes” or “assisted living residence.” The Job Haines certifí-cate of incorporation, however, did specifically state that the “sole and exclusive object is the relief of poor and aged persons of both sexes, who shall by sickness, casualty or other cause be rendered incapable of or attending to their usual occupation or calling.” Ibid. PHP also relies on International Schools Services, Inc. v. West Windsor Township, 22 N.J.Tax 659, 661 (App.Div.2005), rev’g 21 N.J.Tax 553 (2004), for the proposition that its actual use of the subject property as an assisted living facility confirms the purpose set forth in its organizational documents.
*501 The municipality, on the other hand, contends that the organizational documents must make at least passing reference to the purposes set forth in the statute. It notes that the purpose set forth in the PHP certificate of incorporation is limited to charitable purposes within the meaning of § 501(c)(3) of the Internal Revenue Code and that the courts of this State have consistently held that eligibility for exemption from federal income tax is irrelevant to qualification for exemption for purposes of local property taxation under N.J.S.A. 54:4-3.6. See, e.g., Paper Mill Playhouse, supra, 95 N.J. at 523 n. 7, 472 A.2d 517; Presbyterian Homes of the Synod of New Jersey v. Div. of Tax Appeals, 55 N.J. 275, 286 n. 3, 261 A.2d 143 (1970); Black United Fund v. City of East Orange, 17 N.J.Tax 446, 449 (1998), aff'd, 19 N.J.Tax 480 (App.Div.2001). Relying on Black United Fund, the municipality asserts that “statements of purpose which are clearly intended only to provide for an exemption under § 501(c)(3), and make no mention of the exempt purposes under N.J.S.A. 54:4-3.6, are insufficient.” Black United Fund of New Jersey, supra, 19 N.J.Tax at 483.
The municipality also contends that the bylaws contain purposes beyond the bounds of the hospital purposes exemption PHP claims, such as developing other housing facilities and health and welfare services programs or facilities for persons of any age to help meet social needs. It therefore argues that PHP is not organized exclusively for hospital purposes, even as those purposes have been expanded by the Legislature to include health care facilities for the aged.
The cases do not provide consistent guidance as to the scope of the inquiry that the Tax Court is required to make in determining whether the entity claiming exemption is organized exclusively for the purpose for which exemption is claimed. Some decisions of this court looked at the entity’s operations as well as its organizational documents to make that determination. See Intercare Health Sys. v. Cedar Grove Tp., supra, 11 N.J.Tax at 430-31; Fountain House of New Jersey, Inc. v. Montague Tp., 13 N.J.Tax 387, 400 (1993). Later, the Tax Court clarified that, consistent with the statutory language, it is solely the organizational docu *502 ments from which the exclusive purpose must be determined. See 1711 Third Ave., Inc. v. City of Asbury Park, 16 N.J.Tax 174,180-81 (1996) (collecting cases). This construction of the statute was explicitly adopted by the Appellate Division in Southern Jersey Family Medical Centers, Inc. v. City of Pleasantville, supra, 351 N.J.Super. at 271-72, 798 A.2d 120. See also Planned Parenthood of Bergen County, Inc. v. Hackensack, 12 N.J.Tax 598, 610 n. 6 (1992), aff'd per curiam, 14 N.J. Tax 171 (App.Div.1993) (rejecting the Tax Court’s inquiry into the operations of the corporation in Intercare, stating, “the better view is that the term ‘organized’ in the statute refers to the entity’s organizational documents, its corporate charter”).
More recently, however, the Appellate Division concluded that, while courts are generally limited to an examination of the organizational documents in determining whether this statutory requirement had been met, “courts are not barred from considering extrinsic information if relevant to ascertaining the meaning of the corporate documents.” Int’l Sch. Servs., Inc., supra 22 N.J.Tax at 661. The extrinsic evidence in that case was a certification as to the historical circumstances surrounding the founding of the organization. Int’l Sch. Servs., Inc. 21 N.J.Tax 553, 556 (2004).
The Appellate Division decision in International Schools Services gives no indication that this court may look to the operations of the entity in conjunction with the organizational documents to discern the purpose for the entity’s organization. I also do not read that opinion as permitting an entity to provide by way of certification or testimony solicited specifically for the tax exemption litigation regarding a purpose for the organization that is not readily inferable from the organizational documents themselves. Rather, International Schools Services stands for the proposition that, where organizational documents suggest an exempt purpose, the court may consider the historical context to confirm that purpose. I conclude that PHP’s assertion that the operations conducted at a property give meaning to the owner’s organizational documents is contrary to the statutory language and is incorrect.
*503 PHP’s certificate of incorporation states that it is organized exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. As the municipality emphasizes, the requirements of I.R.C. § 501(c)(3) are unrelated to the standards for property tax exemption set forth in N.J.S.A. 54:4-3.6, which has more restrictive standards. Planned Parenthood of Bergen County, supra, 12 N.J.Tax at 604 n. 4; see also Presbyterian Homes v. Div. of Tax Appeals, supra, 55 N.J. at 286 n. 3, 261 A.2d 143. Nevertheless, it is clear that hospitals fall within the category of organizations eligible for exemption under I.R.C. § 501(c)(3) as “charitable.” See Rev. Rul. 69-545, 1969-2 C.B. 117; Rev. Rul. 83-157, 1983-2 C.B. 94 (both concluding that, under the facts stated, nonprofit hospitals were exempt from federal income tax on corporations).
The purposes set forth in PHP’s bylaws, if read literally, could be construed to extend to activities beyond those of operating health care facilities for the elderly, as the municipality contends. The words of the organizational documents should not, however, be construed literally, but should be read sensibly and reasonably. Hunterdon Med. Ctr., supra, 22 N.J.Tax at 316-17, quoting Jersey Shore Med. Ctr. v. Neptune Tp., supra, 14 N.J.Tax at 56. Moreover, the Appellate Division has cautioned against construing the language of an entity’s organizational documents too narrowly, particularly in the context of a summary judgment motion. Int’l Sch. Servs., Inc. v. West Windsor, supra, 22 N.J.Tax at 665. Although other activities are possible under PHP’s bylaws, those purposes appear to be complementary to the primary purposes set forth in those bylaws: providing elderly, disabled, and other needy persons with housing facilities, and medical, nursing, and physical care, and providing meals, nutritional, medical, and housekeeping services, assistance in daily living and other charitable assistance to needy individuals. PHP’s principal purposes are consistent with the hospital purposes exemption set forth in N.J.S.A. 54:4-3.6, as amended by L. 1993, c. 166, and additional ancillary purposes should not destroy PHP’s exemption. See Jersey Shore Med. Ctr., supra, 14 N.J.Tax at 55-56.
*504 Even the purpose about which the municipality is particularly concerned, “to make distributions to charitable organizations described in section 501(c)(3) of the [Internal Revenue] Code in furtherance of the Corporation’s purposes,” does not destroy PHP’s “exclusive organization” for exempt purposes. Unlike the certificate of incorporation in 1711 Third Avenue, Inc., supra, 16 N.J.Tax at 181, or Black United Fund, supra, 17 N.J.Tax at 449-50, the distribution of monies to other organizations is not the sole or principal purpose of the organization; rather, PHP’s bylaws contemplate the distribution of money in furtherance of its primary purpose of providing the elderly, disabled, and other needy persons with assisted living housing and care.
The issue then becomes whether the charitable purposes set forth in PHP’s certificate of incorporation together with the hospital purpose of operating an assisted living facility set forth in PHP’s bylaws, cause PHP to fail the statutory requirement that PHP be organized “exclusively” for hospital purposes. As discussed above, there has traditionally been a charitable component to the hospital purposes exemption. The hospital purposes exemption, as it was amended by L. 1993, e. 166, has been held to apply to a corporation whose articles of incorporation stated that its sole purpose was “the relief of poor and aged persons of both sexes, who shall by sickness, casualty or other cause be rendered incapable of or attending to their usual occupation or calling.” Job Haines Home, supra, 19 N.J.Tax at 415. The court concluded that the foregoing corporate purpose, which embodies both charitable and health care elements was sufficient to satisfy the “exclusively organized” for hospital purposes test. Ibid. In any event, the prevailing view is that a multipurpose organization, all of whose purposes fall under one or another of the exempt purposes described in N.J.S.A. 54:4-3.6, meets the organizational test. Jersey Shore Med. Ctr., supra, 14 N.J.Tax at 57-58 n. 2.
Accordingly, I conclude that PHP’s certificate of incorporation does not destroy its eligibility from exemption as organized exclusively for hospital purposes under N.J.S.A. 54:4-3.6. Mindful of the Appellate Division’s direction that corporate documents should not be read too narrowly in determining eligibility for exemption, *505 particularly in the context of a summary judgment motion, International Schools Services, Inc. v. West Windsor, supra, 22 N.J.Tax at 665, and reading PHP’s certificate of incorporation together with the bylaws, I conclude that PHP was formed exclusively for hospital purposes within the meaning of N.J.S.A. 54:4-3.6.

Actual Use for the Exempt Purpose

There is no dispute that the subject property is operated as an assisted living facility for the elderly. The municipality contends, however, that the subject property is not actually used for the exempt purpose because Stony Brook is operated for the purpose of earning money for PHS. It relies on Christian Research Institute v. Dover, 5 N.J.Tax 376 (1983), in which the court denied a charitable purposes exemption for a nursing home and retirement facility, where the subject property was intended to earn a profit for its parent, which disseminated religious information. The court held that the parent’s organization for religious purposes was not controlling where the subject property itself was not “actually and exclusively used for religious and charitable purposes.” Id. at 386. In contrast to the facts of Christian Research Institute, however, PHS is a nonprofit corporation whose organizational purposes are substantially similar to those of PHP. The municipality argues, however, that the fees earned by PHS from PHP in connection with the facility management agreement are used by PHS to subsidize other facilities affiliated with PHS, specifically affordable housing facilities that are not health care facilities for the elderly that are eligible for exemption pursuant to N.J.S.A. 54:4-3.6.
The municipality relies on the opinion of its consultant, a certified public accountant with substantial experience auditing for-profit and not-for-profit assisted living facilities, who prepared two reports for the municipality in connection with these cross-motions. As set forth in his reports, it is the consultant’s opinion that PHP is not organized exclusively for hospital purposes because its operations are designed to generate revenues to be used to support other controlled affiliates of PHS. I construe the *506 consultant’s opinion to relate to the actual operation of Stony Brook rather than to the organization of PHP. He also opined as to whether PHP is operated on a not for profit basis, which will be discussed below.
PHP moves to exclude the opinions of the municipality’s consultant. As I understand PHP’s motion, it is only to exclude the consultant’s opinions and not to exclude the expert’s report, which PHP itself refers to and relies upon. PHP’s motion is made on the ground that the consultant’s opinions are legal conclusions based on his interpretation of the legal standards applicable to this case and are not accounting opinions. PHP also contends that the expert’s opinions are net opinions because they are not supported by any facts in the record.
In his deposition testimony, the consultant freely admitted that counsel for the municipality directed him to use the legal standards set forth in the Job Haines decision in forming his opinion. Pie also conceded that the term “not for profit” is not an accounting term and that whether or not a corporation is operated on a not for profit basis is not an accounting test. For the following reasons, I am denying PHP’s motion to exclude the expert’s testimony, but I give the consultant’s ultimate opinions no weight, because they are based on supposition rather than on any facts.
[A] court may accept an expert’s opinion, may reject an expert’s opinion in total, or may accept part of an expert’s opinion and reject other parts of it. The Judiciary and fact-finding bodies are not bound by the opinions of expert witnesses. The weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his opinion. The weight and value of expert testimony are for the trier of the facts. An expert’s opinion may be adopted in whole or in part or completely rejected.
[Atlantic City v. Ginnetti, 17 N.J.Tax 354, 361-62 (1998) (citations omitted).]
The municipality’s consultant stated that the management fee paid by PHP to PHS is standard in the market, but stressed that PHP is, to all intents and purposes, a controlled affiliate of PHS and that the management fee was not the result of an arms-length negotiation. He noted that while assisted living facilities and continuing care communities affiliated with PHS are charged a 5% management fee, the affordable housing facilities affiliated with PHS are charged between 2.5% and 5%. The consultant opined *507 that the effect of the management agreement between PHS and PHP would be to generate profit within PHS which PHS could then use to benefit its other operations, namely the affordable housing facilities. PHS emphasizes that the management services it provides for an affordable housing facility are essentially apartment management services, and not the personal and health care services that are provided in addition to the physical plant of an assisted living facility. In other words, PHS provides more services and has more duties in connection with its management of an assisted living facility than it does in managing an affordable housing apartment building and the difference in management fees is reflective of the level of service provided to the particular affiliate.
The municipality’s consultant also points to the charge-back payments made by PHP to PHS for a portion of the corporate IT services, centralized accounting services, and legal services, and emphasizes that they have not “been evaluated against their value to PHP or the costs of obtaining these services from other vendors or by use of in-house employees.” He again stresses that the affordable housing facilities are charged lesser percentages or, in some cases, nothing. While all of this is true, 1 conclude that the charge-backs are based on a good-faith estimate of the relative cost of providing these services to PHP and not on a scheme to divert revenues from PHP to other PHS operations. I also find that the management fee charged by PHS is a market rate for affordable housing facilities and was not designed to favor affordable housing units to the detriment of assisted living facilities operated by PHS.
In sum, there is no factual basis to support the consultant’s opinion that PHP is operated for the purpose of generating profit for PHS which then diverts the income to purposes other than assisted living facilities. PHP actually operates an assisted living facility. The real issue is whether the operation of that assisted living facility is actually for hospital purposes within the meaning of N.J.S.A. 54:4-3.6.[6]
*508 PHP argues that there is no question that it is entitled to exemption because Stony Brook is used as an assisted living facility which is defined as a hospital purpose pursuant to N.J.S.A. 54:4-3.6, as amended by L. 1993, c. 166. The inquiry is not as simple as PHP contends.
As explained above, the legislative intent in amending N.J.S.A. 54:4-3.6 by including health care facilities for the elderly within the hospital purposes exemption was intended to incorporate the notion of charitable care and access to health care services that have traditionally been provided by hospitals. As PHP’s own organizational documents state, it was intended that Stony Brook provide the “elderly, disabled and other needy persons with housing facilities, medical, nursing and physical care” and “provide meals, nutritional, medical and housekeeping services, assistance in daily living and other charitable assistance to needy individuals.”
However, unlike a hospital, Stony Brook does not provide appropriate services to persons regardless of their ability to pay. Stony Brook is not open to anyone who seeks admission, and it does not provide any charitable care. Rather, it admits two classes of residents. The first class, constituting the overwhelming majority, is composed of those that are financially able to afford basic fees that, at a minimum, amounted to approximately $2500 per month (or $30,000 per year) and could have exceeded $5000 per month (or $60,000 per year) during the period covered by these motions, depending on the size of the suite desired by the resident and the intensity of the services needed by the resident. Before admission, potential residents have to demonstrate that they have the means to cover the costs of two years’ residence at Stony Brook, or $60,000 to $120,000. Assisted living services in excess of basic services are subject to additional, non-trivial *509 charges, such as $5 to $10 per day, or an additional $150 to $300 per month on average, for assistance with incontinence products during the tax years in issue. According to PHP’s marketing plans for 2003 and 2004, both the basic fees and the extra charges imposed by Stony Brook were comparable to those imposed by private for-profit operators of assisted living facilities that competed in the same geographic area served by PHP during the period in issue in these cases. In Job Haines Home, supra the fees charged were below the market standard for comparable for-profit corporations providing similar services. 19 N.J.Tax at 416 n. 5.
The second class of residents admitted by Stony Brook consists of a limited number of Medicaid patients, amounting to no more than four long-term Medicaid patients at any one time during the period 2002 to 2005, in a facility having ninety-six living units and where Medicaid patients were offered only semi-private accommodations. Like all assisted living facilities licensed after August 31, 2001, whether operated on a for-profit or not-for-profit basis, Stony Brook is required to reserve 10% of its beds for Medicaid-eligible residents. See N.J.S.A 26:2H-12.16(b). The Medicaid program reimburses PHP for each Medicaid resident at the rate of $60 per day or approximately $1800 per month. As pointed out by the municipality, a shared suite with two Medicaid patients would bring in revenues of approximately $3600 per month, only slightly less than the basic fees for a standard private suite. Moreover, Stony Brook does not seek out or market to persons eligible for Medicaid and it refuses to guarantee residents admitted on a full-pay basis that it will continue to permit them to reside at Stony Brook if they are no longer able to pay and have to apply for a Medicaid “slot” at Stony Brook. PHP instead reserves the right to evict any resident upon thirty days written notice if a resident fails to pay the monthly charges within thirty days of the due date.
The financially well-off, and a few of the very poor are able to gain admission to Stony Brook. Those falling between these two extremes would not be admitted, since Stony Brook’s financial eligibility “rule of thumb” is that a resident must be able to pay privately for two years, based on the assumption that a resident *510 will die or move to a skilled care facility within that time period. There is no “sliding scale” of fees based on ability to pay. Cf. Southern Jersey Family Med. Ctrs., supra, 351 N.J.Super, at 268, 798 A.2d 120 (self-paying customers charged on sliding fee scale).
PHP assei'ts that no facility affiliated with PHS has ever evicted a resident who became unable to pay the charges for his or her care. As was intended by PHS, however, PHP is a separate entity, and PHS has no legal obligation to subsidize residents of PHP’s facility. PHP also asserts that another affiliated organization, Presbyterian Homes Foundation, intends to provide a subsidy to PHP to cover any shortfalls arising from a resident’s inability to pay, but only after PHP reaches its target occupancy level. Once again, there is no obligation on the part of that foundation to provide such a subsidy, and no such subsidy was provided during the years 2002 to 2005.
Moreover, forbearance from evicting a resident after he or she has paid for at least two years of residence is qualitatively different than the charitable admission of someone who fails to meet financial admission requirements at the outset. There are business reasons why PHP might elect not to evict a current resident who is in the process of applying for Medicaid eligibility, such as, for example, PHP’s relationship with its other elderly residents who might choose not to remain at Stony Brook under threat of being forced to leave at some future date due to their financial circumstances. The marketing plans developed by PHS for PHP identified as a threat to Stony Brook’s marketability the lack of a guarantee of continued residence after a resident ran out of money and before the resident was able to obtain a Medicaid “slot.”
PHP suggests that its provision of housing and services for the elderly is by itself a charitable endeavor. As noted above, PHP does not provide these services to the general elderly population, but to a select class of persons of means and a limited number of an equally select group of persons without means who require government assistance in the form of Medicaid. Moreover, the Supreme Court of New Jersey has soundly rejected a similar *511 assertion made in support of the exemption claim of another facility for the elderly that provided “luxurious retirement facilities to those who are able to pay.” Presbyterian Homes, supra, 55 N.J. at 289, 261 A.2d 143. In that case,[7] the Court concluded:
The basic deficiency in petitioner’:) argument, however, is that the residents of Meadow Lakes have purchased that which they are receiving; quid pro quo permeates the entire operation. If petitioner’s position is sound, then persons of advanced age could simply avoid property taxes by pooling assets in corporate form for their mutual benefit.
[Id. at 287, 261 A.2d 143.]
The Court recognized that care of the aged might be a laudable purpose, and acknowledged that prior decisions of New Jersey courts had concluded that care of the needy aged is a proper concern of government and that property used for that purpose has been held to be eligible for exemption. Id. at 288, 261 A.2d 143 (emphasis added). “But we believe that those cases do not embrace the care of financially independent elderly persons who alone can qualify for admission to Meadow Lakes.” Ibid.
In sum, the services provided at the subject property are not available to anyone that seeks them, and there is no provision for any kind of charitable assistance to those who cannot demonstrate they have sufficient assets available to pay Stony Brook’s fees in full for two years. Stony Brook’s clientele is generally financially well off and that clientele is required to pay for any services received. The accommodations actually used by Medicaid recipients at the subject property during the period in issue were extremely limited. Those accommodations are made available by PHP as a condition of Stony Brook’s licensing as an assisted living facility. The evidence, including particularly the limited audience to which PHP’s marketing is directed, its reservation of the right to evict in the event of inability to pay, and the Medicaid policy contained in its disclosure handbook, indicates that PHP admits Medicaid recipients grudgingly and is not supportive of a finding *512 of charitable purpose. I conclude that Stony Brook is not operated for the charitable and hospital purposes envisioned by its organizational documents, or for the “hospital purposes” contemplated by N.J.S.A. 54:4-3.6.

Not for Profit Operation

The gravamen of the municipality’s objection to exemption for Stony Brook is that the operation of the facility is essentially a “commercial” enterprise with fees comparable to “for profit” facilities. The municipality relies on the opinion of its consultant, who concluded that PHP does not operate on a not for profit basis because its fees and charges are intended to exceed the costs of operating Stony Brook. He points to a projected statement of revenue and expenses prepared in 2002 for PHP indicating that Stony Brook was intended to produce substantial revenues and to have an operating surplus. The statement relied upon by the municipality projects that PHP will have an excess of revenues over expenses of $211,595 by the end of 2006. In 2006 it is also anticipated that PHP will pay PHS a management fee of $277,140. PHP emphasizes that during the years in issue here, Stony Brook has operated at a loss. It also states that any surplus that might be generated by Stony Brook in the future would be retained by PHP as reserves and not distributed for the private profit of any individual.
In Paper Mill Playhouse, supra, the Court set forth the principal criterion by which courts have since determined whether or not a corporation is operated for profit: whether the profits can find their way into anyone’s pocket. 95 N.J. at 522, 472 A.2d 517. That test was recently applied in Hunterdon Medical Center v. Readington Township, supra, 22 N.J.Tax at 318, where it was alleged that a wellness center was operated for profit because it was commercial: its fee structure was comparable to and competitive with the fee structures of private health clubs in the area. Id. at 317. The proofs demonstrated that all revenues from the wellness center were revenues that went to the hospital that operated it and were used for the hospital’s purchase of equipment and other improvements necessary at the hospital. Id. at 318. *513 The court concluded that the Wellness Center was not conducted with the intention of making a profit. It further concluded that generating revenue in excess of expenses does not demonstrate in itself a profit making puipose, nor did a fee structure that was competitive with similar facilities in the area. Id. at 318-19.
I conclude here that there is no evidence that Stony Brook is operated for the purpose of making a profit. No money can be traced to anyone’s pocket. PHS is itself a nonprofit corporation that operated at a loss during the period in issue.
I also find that Stony Brook employees, the Executive Director of Stony Brook and the employees of PHS who perform work for PHP receive reasonable market compensation. Although PHS executives receive bonuses or incentives, they are not based exclusively on financial performance and the evidence indicates their salary and incentive payments considered together are at the 75th percentile indicated in the wage surveys used by PHS. The bonuses are computed as a percentage of grade level compensation midpoint and do not constitute a profit-sharing arrangement. See, e.g., Hunterdon Med. Ctr. v. Readington Tp., supra, 22 N.J.Tax at 319 (describing an incentive plan whereby physicians received actual net revenue in excess of specified amounts with an annual cap and concluding that the medical practice was operated for a profit-making purpose); see also, Paper Mill Playhouse, supra, 95 N.J. at 522, 472 A.2d 517 (“As long as salaries are not excessive, the mere payment of them is not sufficient grounds for denying the tax exemption.”).
I find no evidence that PHP is conducted for profit. PHP provides a comfortable assisted living residence and services for the elderly but the only persons who “profit” from its operation are those that pay for its services. In other words, Stony Brook operates on a quid pro quo basis, as did the continuing care community described in Presbyterian Homes, supra, 55 N.J. at 287, 261 A.2d 143.

Conclusion

For the foregoing reasons, I conclude that the subject property was not eligible for exemption for tax year 2002 because it was not *514 operated as an assisted living facility as of the valuation date of October 1, 2001. I also conclude that the subject property was not eligible for exemption for tax years 2003 and 2004 because it was not actually operated for hospital purposes within the meaning of N.J.S.A. 54:4-3.6. The municipality's motion for summary judgment for those years is granted. PHP’s motion for summary judgment for tax years 2003, 2004, and 2005 is denied. The municipality did not make a motion with respect to tax year 2005. If the parties cannot agree as to a resolution for that tax year, the matter will be scheduled for trial together with any valuation issues for the tax years 2003, 2004, and 2005.

 Although not explicitly explained, the "shared suite” rate appears to be for what is effectively a semi-private suite shared by two unrelated or unaffiliated persons who each enter into a separate residence agreement with PHP, It appears that PHP assigns the persons who will occupy the shared unit. The rate for a second person sharing a suite is applicable to two persons (for example, a married couple) who desire to reside in the same suite and who enter into a joint *482 residency agreement with PHP. The effective rate is the full suite rate plus the charge for the second person.

 The exemption provided by N.J.S.A. 54:4-3.6 is for health care facilities for the elderly. PHP states that it is forbidden by law to exclude persons otherwise eligible for admission solely on the basis of age. PHP cited no statutory *483 provision. See N.J.S.A. 10:1-2, providing for “full and equal accommodations, advantages, facilities and privileges of any places of public accommodation," and N.J.S.A. 10:1-5, deeming any clinic or hospital to be a place of public accommodation.

 The estimate of the number of persons employed by PHP during the years 2002 to 2005 varied, depending upon who was making the estimate. The PHS general counsel stated that PHP had as many as eighty employees. Its treasurer stated there were approximately fifty. An estimate of approximately forty to fifty employees appears to have been the one most consistently made. The number eighty used by the general counsel may have included part-time employees or may have included the total number of persons employed during the years 2002 to 2005, some of whom may have left PHP and been replaced by other individuals. The exact number of employees is not material here.

 Both parties agree that they did discuss a possible PII.OT agreement. In the words of Mr. Schmeirer, the planning board attorney, if PHP "claimed real property tax exempt status, then [PHP] would at least be required to enter into negotiations with Pennington Borough to provide for a payment in lieu of taxes in order to compensate the Borough for providing various municipal services." Mr. Schmeier prepared a draft supplemental developer’s agreement that contained such a provision. According to the draft, the municipal services intended to be covered included but were not limited to police and fire protection. To all appearances, what was contemplated by the municipality was a payment for municipal services that would normally be paid for by taxes. Neither the county nor the school district would receive anything under such an agreement, although taxes on a non-exempt property would include such components. *492 N.J.S.A. 54:4-49. Ms. Cafferty recalled in her deposition testimony that the municipal officials at the meeting "talked about the county and that we didn't have to worry about that.... [T]hey talked about I think the school system but that they could work around that, but October 1 was an important date." Because it is not an issue in this case, I do not pass on the propriety or legality of such an arrangement.

 The square corners doctrine, which seeks to prevent government from conducting itself in a way that would achieve or preserve a bargaining or litigational advantage over a taxpayer, see F.M.C. Stores Co. v. Morris Plains Bor., 100 N.J. 418, 426-27, 495 A.2d 1313 (1985), is inapplicable here. PHP does not claim its benefit, presumably because it recognizes that the municipality has not achieved any advantage in this litigation by denying PHP an exemption.

 In Hunterdon Medical Center, supra, 22 N.J.Tax at 332-33, Judge Kuskin developed an analytical framework (explicitly endorsed by the Appellate Divi *508 sion, see Hunterdon Med. Ctr. v. Township of Readington, 391 N.J.Super. 434, 446, 918 A.2d 675 (App.Div.2007)), for determining whether an off-campus hospital-owned facility was actually used for hospital purposes. Because the Legislature intended that health care facilities for the elderly be deemed "hospital purposes” whether or not the facility was actually affiliated with a hospital, the analytical framework has no utility in this case.

 PHS is the successor to the entity that was the plaintiff in Presbyterian Homes. According to its promotional literature, PHS is no longer legally connected to the Presbyterian Church, but maintains its name “to symbolize our shared mission of caring,” The facility that was the subject of the earlier case is now affiliated with PUS.